SEIBERLING RUBBER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8693. Promulgated February 28, 1947.

*Robert Guinther, Esq.*, for the petitioner.
*L. R. Bloomenthal, Esq.*, for the respondent.

470

472

474

**OPINION.**

KERN, *Judge*: The first issue for consideration is whether the transactions conducted in 1934 whereby petitioner acquired the Kemitex Products, Inc., stock amounted to a nontaxable reorganization within the meaning of section 112 (b) (3), (4), or (5) of the Revenue Act of 1932.[1]

---

SEC. 112. RECOGNITION OF GAIN OR LOSS.

(a) GENERAL RULE.—Upon the sale or exchange of property the entire amount of the gain or loss determined under section 111, shall be recognized, except as hereinafter provided in this section.

(b) EXCHANGE SOLELY IN KIND.—

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

(4) SAME—GAIN OF CORPORATION.—No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR [as amended by section 213 (h) of the Revenue Act of 1939].—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation ; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. Where the transferee assumes a liability of a transferor, or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under section 213 of the Revenue Act of 1939 it is not considered as "other property or money") shall be considered as stock or securities received by such transferor. If, as the result of a determination of the tax liability of the taxpayer for the taxable year in which the exchange occurred, by a decision of the Board of Tax Appeals or of a court which became final before the ninetieth day after the date of the enactment of the Revenue Act of 1939, or by a closing agreement, the treatment of the amount of such liability was different from the treatment which would result from the application of the preceding sentence, such sentence shall not apply and the result of such determination shall be deemed proper.

Petitioner's primary contention that this was a nontaxable reorganization is based upon the provisions of section 112 (b) (5) of the 1932 Act. In support of this proposition petitioner argues, *inter alia*, as follows:

The Petitioner's proprietary interest as creditor in the insolvent old Kemitex Company was transferred to the new Kemitex Company. This interest was "property". It was transferred solely in exchange for stock of the new Kemitex Company and immediately after the exchange the Petitioner was in control of the transferee. No other person made any exchange for all the other creditors retained interests in the new company exactly of the same kind and character as they had held in the old, with the single difference that the time of payment of their claims was deferred.

Such property interest or ownership as stockholders of the old Kemitex Company at one time had in its assets had been completely evaporated when the company became insolvent. The dominant stockholding interest of Petitioner in the old company enabled it, however, to use the old company as a convenient vehicle by which Petitioner's property could be transferred to the new company.

In effect, the old company had become merely the title holder of its assets for the benefit of its creditors, who had become the beneficial owners or equitable claimants of all such assets. Creditors other than Petitioner made no exchange for the new company assumed the obligations owed to them. Because it was the controlling shareholder of the old company—even though the stock was worthless—Petitioner could require the old company, as title holder, to convey its assets to the new in "exchange" for the new company's stock. The "property" which was exchanged was wholly the "property" of the Petitioner, which exchanged it for stock of a controlled corporation in the course of a "business adjustment."

\* \* \* \* \* \* \*

\* \* \* In any event, the Petitioner, considered as creditor, had such a "proprietary interest" in the old Kemitex Company that it was the owner, in reality, of all the property which passed to the new company. The provisions of Section 112 (b) (5) as to "proportionate interests" were fully met. The other creditors gave up no proprietary interests in the old company in exchange for some stock of the new. Instead, the new company assumed those debts as liabilities. Only the Petitioner was left to exchange its interest in the property of the old company for stock in the new. The common and preferred stockholders of the old company no longer had any property rights in it. Because Petitioner was the only holder of an interest in the old company, which exchanged that interest for stock in the new, it was entitled to, and did, receive all the stock of the new. \* \* \* The interests of all owners and creditors in the new company were exactly proportionate to the interests which they had in the old.

Petitioner's contentions, as set forth above, can not be sustained in view of our decision in *Bunker Hill & Sullivan Mining & Concentrating Co.*, 1 T. C. 1057. In that case the taxpayer, Bunker Hill, owned a 50 per cent stock interest in a corporation engaged in the mining business. Bunker Hill and others, stockholders and non-stockholders, made advances from time to time to that corporation. Bunker Hill's advances aggregated $8,702,000, on which repayments were made from time to time, leaving a balance due of $3,776,000, which amount was evidenced by a demand promissory note dated

May 1, 1935, with 5 per cent interest payable annually. On December 30, 1937, the debtor, pursuant to a plan of reorganization to which its creditors agreed on December 8, 1937, transferred all of its assets to a new corporation in exchange for stock. The creditors of the debtor, including nonstockholders, received 88.70 per cent of the issued stock of the new corporation and the stockholders of the debtor, including noncreditors, received 11.30 per cent thereof. The stock of the new corporation was issued directly to the debtor corporation in exchange for its assets and thereafter the debtor corporation distributed these shares to its stockholders and creditors in accordance with the plan and in amounts previously agreed upon. Embodied in the plan was a provision that all of the property of the debtor corporation was to be transferred to the new corporation free and clear of all debts and liabilities except for certain indebtedness in the amount of $500,000 due a preferred creditor, which indebtedness was assumed by the new corporation. In holding that this transaction did not come within the scope of section 112 (b) (5) of the Revenue Act of 1936, which, in so far as here material, reads the same as the section now under consideration, we stated:

> Petitioner presents three reasons why the rationale of the *Cement Investors* case, *supra*, is inapplicable here: First, it transferred no property to the new corporation; * * *.
>
> * * * We have little difficulty in agreeing with petitioner on the first point made. It is stipulated that "Treadwell Yukon [the debtor corporation] sold, conveyed and transferred all of its assets to the new corporation" on December 30, 1937 * * *. Prior thereto there had been no division or distribution of the debtor's assets among its creditors or its stockholders. In the absence thereof we can not see how it can be said that the creditors or stockholders transferred the assets to the new corporation or that Treadwell Yukon acted as agent or trustee for either group in so doing. In our opinion it acted for itself, as the parties have stipulated. Until a court of equity intervenes stockholders and creditors are not the owners of the corporate assets, notwithstanding the insolvency of the corporation. *Hollins* v. *Brierfield Coal & Iron Co.*, 150 U. S. 371, 382, 383. In the *Cement Investors* case, *supra*, the Court specifically pointed out that ownership of the equity in the debtor companies effectively passed to the creditors when the processes of law were invoked to enforce their rights of full priority and at least as early as when the creditors instituted section 77B proceedings under the Bankruptcy Act whereby they excluded the stockholders. It can not be said that the voluntary compromise entered into by petitioner's creditors on December 8, 1937, excluded the stockholders and passed the ownership of the equity in the debtor corporation to the creditors, enabling them to enforce their rights of full priority, as was the effect of the court order in *Cement Investors, supra*.

The facts in the case at bar are much the same as those in the *Bunker Hill* case. Here, too, the creditors received stock and promissory notes of the new corporation. Furthermore, some of the former stockholders, the preferred shareholders other than petitioner, participated as shareholders. In neither case did the creditors invoke the

processes of law to enforce their rights of full priority. It must be noted that in all of the cases which have come to our attention and which treat the creditors of an insolvent corporation as stepping into the shoes of the stockholders, the processes of law were invoked by the creditors.[2] See *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U. S. 179; *Bondholders Committee, Marlborough Investment Co. First Mortgage Bonds* v. *Commissioner*, 315 U. S. 189; *Palm Springs Holding Corporation*, 315 U. S. 185; *Helvering* v. *Southwest Consolidated Corporation*, 315 U. S. 194; *Helvering* v. *Cement Investors, Inc.*, 316 U. S. 527. Therefore, it appears that in the instant case the real transferor was Kemitex Products Co., which never received any stock from Kemitex Products, Inc., and, accordingly, the transfer does not qualify under section 112 (b) (5).

However, assuming for the sake of argument that the creditors of the insolvent Kemitex Products Co. did "step into the shoes" of its stockholders, we still think that petitioner can not prevail in its contentions based upon section 112 (b) (5). In *Helvering* v. *Cement Investors, Inc.*, *supra*, the Supreme Court, in discussing the corresponding section of the Revenue Act of 1936, stated:

> In the case of reorganizations of insolvent corporations the creditors have the right to exclude the stockholders entirely from the reorganization plan. When the stockholders are excluded and the creditors of the old company become the stockholders of the new, "it conforms to realities to date their equity ownership" from the time when the processes of the law were invoked "to enforce their rights of full priority". * * * Under that approach the ownership of the equity in these debtor companies effectively passed to these creditors at least when § 77B proceedings were instituted. But however their interest in the property may be described, it clearly was an equitable claim in or to it. * * * The transfer of the properties of the debtor companies to the new corporation was made pursuant to that plan. * * * Thus, it is fair to say that the property transferred was property in which the creditors had an equitable interest and that the transfer was made with their authority and on their behalf. Certainly "property" as used in section 112 (b) (5) includes such an interest in property. And we see no reason to conclude that a beneficial owner of, or equitable claimant to, property is precluded from consummating an exchange which qualifies under section 112 (b) (5) merely because the actual conveyance is made by his trustee or title holder. * * *

Thus, the property transferred to Kemitex Products, Inc., by Kemitex Products Co. was property in which the creditors of the old company had an equitable interest and the transfer was made on their behalf. All of the creditors had equitable or proprietary interests in the property transferred, yet petitioner would have us ignore the proprietary interests of the other creditors and treat it as

---

[2] In *Helvering* v. *Alabama Asphaltic Limestone Co.*, *supra*, the Supreme Court stated: "When the equity owners are excluded and the old creditors become the stockholders of the new corporation, it conforms to realities to date their equity ownership *from the time when they invoked the processes of law* to enforce their rights of full priority. *At that time they stepped into the shoes of the old stockholders.*" (Italics supplied.)

the sole equitable owner of the property transferred. Petitioner's analysis does not stand up under scrutiny. Even though we assume that Kemitex Products Co. was only nominally the transferor, we would have to regard the property transferred by the old corporation to the new as being property in which all the creditors shared in an equity sense and the transfer as being made on behalf of the entire body of creditors. *Commissioner* v. *Sisto Financial Corporation*, 139 Fed. (2d) 253, 256. Section 112 (b) (5) provides, *inter alia*, that no gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation. Under the assumed hypothesis, Kemitex Products Co. did not receive the stock of the new corporation in exchange for its property, nor was it the "person" in control of the transferee after the exchange. If we regard the creditors, as holders of equitable interests in the property transferred, as being the real transferors, it would be necessary under section 112 (b) (5) that these transferors be in "control" of the transferee after the exchange. Such control is defined in section 112 (j) of the 1932 Act as meaning the ownership of at least 80 per cent of the voting stock and at least 80 per cent of the total number of shares of all other classes of stock of the corporation. True, petitioner wound up with more than 80 per cent of all the stock of the new company, but the statute pertains to situations where "property is transferred to a corporation by one or *more* persons * * * and immediately after the exchange *such* person or *persons* are in control of the corporation." This means that where, as here, property is transferred by or on behalf of a number of persons that "such persons" (i. e., all those persons) must share in the control after the consummation of the exchange. We think it would be a gross distortion of section 112 (b) (5) to say that where there is more than one transferor it is sufficient if only one of the transferors has any sort of control after the exchange.[3] The section requires an identity of interest before and after the exchange.[4] *Pacific Public Service Co.*,

---

[3] Cf. Regulations 77, art. 572, wherein it is stated:

"In the following cases no gain or loss is recognized:

*       *       *       *       *       *

"(c) If property, real, mixed or personal, is transferred to a corporation * * * by *two or more persons* solely in exchange for stock or securities in such corporation, and if immediately after the exchange *such persons* are in control of the corporation, and the amount of stock or securities received *by each* is substantially in proportion to his interest in the property prior to the exchange." (Italics supplied.)

See also Mertens, Law of Federal Income Taxation, § 20.44, vol. 3, p. 167, note 88, wherein the comment is made: "It would seem that the requirements for continuity of interest are just as strict under Sec. 112 (b) (5) as they are in cases of corporate reorganization, and that, consequently, a failure to give some of the transferors a stock interest in the transferee would make the transfer taxable."

[4] See Mertens, *supra*, vol. 3, p. 169, which points out that "each transferor had to maintain his same relative stake in the venture or assets in the form of stock and securities of the transferee for all of the transferors to escape recognition of gain or loss."

4 T. C. 742, 747; affd., 154 Fed. (2d) 713; and *Miller & Paine*, 42 B. T. A. 586, 593.

This conclusion is also supported by the further requirement of section 112 (b) (5) that, in the case of an exchange by two or more persons, the section shall apply only if the amount or stock of securities received by each is substantially in proportion to his interest in the property prior to the exchange. The total unsecured indebtedness of Kemitex Products Co. amounted to $409,470.47, of which $323,993.73 was owing to petitioner. If, for present purposes, we treat the unsecured creditors of the company as succeeding to the entire proprietary interest of the stockholders in the company, petitioner's equity interest in the property of the old company amounted to about 79 per cent of the total. Yet, after the transfer of property by the old company to the new, petitioner held about 95 per cent of the proprietary interest in that property.[5] The other unsecured creditors retained no proprietary interest in the enterprise, since they received only short term notes or the obligation to them was merely assumed by the new company. *Le Tulle v. Scofield*, 308 U. S. 415. It is clear, therefore, that even under the assumed hypothesis the amount of stock or securities of Kemitex Products, Inc., received by each of the transferors was not substantially in proportion to its interest in the old company's property prior to the exchange. *Commissioner* v. *Sisto Financial Corporation, supra.*

As has heretofore been pointed out, the statute requires that the transfer of property be solely in exchange for stock or securities of the transferee. The short term notes which the transferors other than petitioner received were not securities within the meaning of the section. Although no case has been cited by the parties wherein the term "securities" as used in section 112 (b) (5) has been defined, it is well settled that term "securities" as used in section 112 (b) (3) does not include short term notes such as many of the old company's creditors received. *Pinellas Ice Co.* v. *Commissioner*, 287 U. S. 462, 468; *Commissioner* v. *Sisto Financial Corporation, supra; Neville Coke & Chemical Co.* v. *Commissioner*, 148 Fed. (2d) 599; and *Pacific Public Service Co.* v. *Commissioner*, 154 Fed. (2d) 713. We see no reason to doubt that the term "securities" as used in paragraph (3) of section 112 (b) has the same meaning when used in paragraph (5) of the same section and subsection. Even on the hypothesis assumed, *arguendo*, that the property was, in reality, transferred by or on behalf of the creditors of Kemitex Products Co., since all the transferors except petitioner received something other than stock and securities from the transferee, the property was not transferred *solely* in ex-

---

[5] The other 5 per cent of the proprietary interest went to those persons other than petitioner who had owned preferred stock in the old company.

change for stock or securities, as required by the section. It is even doubtful whether petitioner itself received only stock and securities from Kemitex Products, Inc., for petitioner's proposal to the old company read, "We will accept all of the authorized capital of the new company *and the note* of the new company for $23,993 due and payable on December 31, 1936, at two per cent interest per annum, in full settlement of our unsecured claim amounting to $323,993." (Italics supplied.)

Petitioner contends *Helvering* v. *Cement Investors, Inc., supra,* and *Miller & Paine, supra,* are controlling in the case at bar. However, both of those cases are distinguishable factually from the instant case for the same reasons as we expressed in the *Bunker Hill* case, *supra.*

For the various reasons which we have given, we conclude that petitioner can not be sustained in its contention that the transaction whereby it acquired the Kemitex Products, Inc., stock in 1934 qualifies as a nontaxable reorganization within the meaning of section 112 (b) (5) of the 1932 Act.

Although petitioner rests its case principally on the applicability of section 112 (b) (5), further contentions are advanced that the 1934 transfer constituted a tax-free exchange within the meaning of paragraphs (3) and (4) of section 112 (b), *supra.* Both of these paragraphs have the same requirement as does 112 (b) (5), heretofore discussed, namely, that the exchange be solely for stock or securities. Whether we consider the Kemitex Products Co. to be the transferor or the creditors of that corporation to be transferors, we would be unable to conclude that only "stock or securities" were received in exchange for the property from the transferee, Kemitex Products, Inc. It is therefore our opinion that the 1934 transfer does not qualify as a tax-free exchange under section 112 (b) (3) and (4). *Pinellas Ice Co.* v. *Commissioner; Commissioner* v. *Sisto Financial Corporation; Neville Coke & Chemical Co.* v. *Commissioner;* and *Pacific Public Service Co.* v. *Commissioner,* all cited *supra.*

The second question presented in this proceeding is whether petitioner, in computing its equity invested capital under the excess profits tax provisions in effect during petitioner's taxable years 1941 and 1942, is entitled to include in its accumulated earnings and profits at the beginning of each of those taxable years such portion of the partial bad debt deduction claimed by petitioner in the taxable year 1939 as was disallowed by the Commissioner as a deduction from gross income in that year. Petitioner claimed a partial bad debt loss of $2,300,000 in its return for the taxable year 1939, of which the Commissioner disallowed $1,361,495.81. If petitioner is not entitled to such an inclusion in its accumulated earnings and profits of the amount above stated, the further question is presented as to whether

petitioner is entitled to add to its accumulated earnings and profits at the beginning of each of those taxable years the sum of $1,319,644.21, which amount was agreed upon by the parties for the purpose of settling the income tax dispute involved in respondent's disallowance of the bad debt deduction as being petitioner's taxable income for the taxable year 1939. The pertinent statutory provisions are set forth in the margin.[6]

Although not expressed in so many words, petitioner appears to urge that upon disallowance of part of the bad debt deduction of 1939, the amount disallowed as a deduction for income tax purposes was automatically "restored" to its accounts receivable and must, therefore, be considered as a part of its accumulated earnings and profits for excess profits tax purposes. Petitioner also urges that because the respondent disallowed a portion of the bad debt deduction and thereby secured an income tax advantage for the taxable year 1939, the respondent is now estopped to deny that the portion disallowed should be restored to invested capital for excess profits tax purposes. In the alternative, petitioner argues that since it was determined, as part of the settlement agreement, that petitioner had taxable net income amounting to $1,319,644.21 in the taxable year 1939, it had earnings and profits in an identical amount in that year, which, not having been shown to have been lost or disposed of, have continued to be part of petitioner's accumulated earnings and profits at the beginning of subsequent taxable years.

In considering petitioner's contentions, the question as to what are "accumulated earnings and profits" immediately arises. The term is not defined in the Internal Revenue Code, but, in general, the concept of "accumulated earnings and profits" for the purpose of the excess profits tax is the same as for the purpose of the income tax. *Federal Union Insurance Co.*, 5 T. C. 374, and Regulations 112, sec. 35.718. As we pointed out in *Taylor-Wharton Iron & Steel Co.*, 5 T. C. 768, 782, the concept of accumulated earnings and profits for the

---

[6] Sec. 715, I. R. C., as added by sec. 201, Second Revenue Act of 1940:

"For the purposes of this subchapter the invested capital for any taxable year shall be the average invested capital for such year, determined under section 716. * * *."

Sec. 716, I. R. C.:

"The average invested capital for any taxable year shall be the aggregate of the daily invested capital for each day of such taxable year, divided by the number of days in such taxable year."

Sec. 717, I. R. C.:

"The daily invested capital shall be the sum of the equity invested capital for such day plus the borrowed invested capital for such day * * *"

Sec. 718, I. R. C.:

"(a) DEFINITION.—The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

* * * * * * *

"(4) EARNINGS AND PROFITS AT BEGINNING OF YEAR.—The accumulated earnings and profits as of the beginning of such taxable year; * * *"

purpose of the excess profits tax contemplates, basically, the sum of the earnings less the losses sustained.

Prior to the taxable year 1939 petitioner had on its books an account receivable owed to it by its subsidiary, the Sales Co., and exceeding $2,300,000 in amount. In its return for that year petitioner reported to the Commissioner that $2,300,000 of that debt had become bad and uncollectible, and that it had charged off that portion of the account receivable.

Accordingly, it deducted the sum of $2,300,000 from its gross income for 1939 and reported as net income for that year the sum of minus $88,763.88. The Commissioner disallowed the bad debt deduction and at some unknown date after the disallowance the parties reached an agreement whereunder $938,504.19 of the $2,300,000 deduction was allowed and the balance of $1,361,495.81 was disallowed. The agreement stated that $674,390.81 of the $1,361,495.81 had been disallowed, not because that portion of the debt was collectible, but because petitioner had availed itself of losses of the subsidiary to the extent of $674,390.81 in consolidated returns filed for previous years. The agreement and the entire record in this case are silent as to the reason for the disallowance of the remaining $687,105 of the total amount not allowed. The question immediately comes to mind as to whether $687,105 of the deduction was disallowed for the year ended October 31, 1939, because that portion of the debt had become bad at some time prior to that year. All that we do know is that in 1939 petitioner determined that $2,300,000 of this debt became uncollectible, charged it off, and deducted this amount from its 1939 income; and that at the time the collateral agreement was executed, the petitioner did not expect that the Sales Co. would be able to pay the portion of the bad debt deduction which had been disallowed, i. e., $1,361,495.81, nor did petitioner expect to collect that sum from its subsidiary. This collateral agreement was executed at some date after petitioner had filed its return for the taxable year 1941 and before the filing of its return for the taxable year 1942. Since petitioner makes no contention supported by any fact that the debt deducted as bad in 1939, or any part thereof, was collectible in 1939, or later years, and has not established the time, or times, when the loss was sustained, we are required to presume, in view of respondent's determination of deficiency in the instant case, that the loss arising by reason of the partial bad debt, which was in the amount of $687,105 and was disallowed for a reason not shown by the record, was sustained in some year prior to 1939. This, it should be pointed out, is a presumption arising from respondent's determination, not inconsistent with the facts disclosed by the record.

We therefore approach the problem on the presumption that in 1939, or in prior years, petitioner had suffered a loss by reason of a partially worthless debt in the sum of $2,300,000 which had been charged off its books as an account receivable and had been deducted from its 1939 earnings, and the further assumption that its accumulated earnings and profits and surplus account had been correspondingly decreased by the means of reducing by this amount the 1939 income which was, at the end of that year, carried to petitioner's accumulated earnings and profits. This amount was deducted by petitioner from its gross income returned for 1939, resulting in a net income figure reported for that year of minus $88,763.88. If the deduction was claimed in good faith, and we see no reason to suppose otherwise, petitioner would, in the normal course of its business, reflect the charge-off of the partially bad debt in its accumulated earnings and profits by a decrease in such accumulated earnings and profits in the amount of minus $88,763.88, representing the amount of its 1939 earnings less the amount of the bad debt. At a later date respondent, for a reason undisclosed on the record, disallowed this deduction. At a still later date, sometime between the filing by petitioner of its return for 1941 and the filing of its return for 1942, petitioner and respondent settled their controversy with regard to this deduction, by an agreement whereby "the partial bad debt claimed of $2,300,000 has been reduced by the sum of $674,390.81, representing losses of the subsidiary company availed of by the parent in consolidated returns filed for previous years, and that such claimed partial bad debt has been further effectively reduced by the amount of $687,105, making a total of $1,361,495.81 disallowed in arriving at such offer of settlement."

So far as appears from the record, respondent did not then refuse, nor has he since refused, to recognize the partial bad debt loss sustained by petitioner; he merely refused to permit petitioner to deduct a part of this partial bad debt in 1939. As to $674,390.81 thereof, the reason is given that, although respondent did not question that the debt in question was to this extent bad and uncollectible and charged off in 1939, nevertheless, it was not deductible in that year because it had, in effect, been deducted in prior years by reason of the deduction in those years of the subsidiary's operating losses.

Thus, what facts we have indicate affirmatively that this part of the partial bad debt loss in the amount of $674.390.81, as we said in *Taylor-Wharton Iron & Steel Co.*, *supra* (p. 780), was "a recognized loss, even though * * * it was disallowed as a deduction." Furthermore, they indicate that this part of the partial bad debt deduction had been in effect allowed in prior years. While the question presented in the *Taylor-Wharton Iron & Steel Co.* case was a somewhat different one, and the manner in which it arose was, in effect, the converse of the manner in which the issue is presented here, we think that the basic

reasoning of that case is helpful here. It is, in our opinion, authority by analogy for our conclusion in this case that a realized loss (using that word in its wider meaning) which is of a class recognized as a deductible loss under the code, and which, under proper accounting practices, is properly chargeable against accumulated earnings and profits, should be used to reduce accumulated earnings and profits under section 718 (a) (4) of the Internal Revenue Code, even though it is disallowed as a deduction from gross income for income tax purposes in the year taken for some reason other than one which goes to its recognition.

As to that part of the partial bad debt disallowed in 1939 in the sum of $687,105, and for which no reason is given in the settlement agreement, there is nothing in the record to indicate that the disallowance was due to either party considering that it was not recognizable under the code as, in fact and in law, a partial bad debt properly to be charged off as such by petitioner. The only thing which appears is that respondent held that it was not allowable as a deduction from petitioner's gross income in 1939, and that the parties agreed that, for the purpose of settling petitioner's income tax liability for that year, it would not be claimed as a deduction. There is nothing in the record to indicate that it was disallowed because either party considered that in fact and in law there was no partial bad debt in this amount which was recognizable as such under the Internal Revenue Code. The record affirmatively indicates that it was not good and collectible in either of the taxable years.

Let us suppose the following hypothetical case: Corporation X has among its accounts receivable a debt of Corporation Y which is reflected in its accumulated earnings and profits. That debt becomes worthless and should have been taken as a deduction in 1939. Mistakenly X deducts this item in 1940 and makes the corresponding adjustment to its accumulated earnings and profits in that year. The Commissioner disallows this deduction on the ground that it should have been taken in the earlier year. A consideration of X's return for 1939 is barred by the statute of limitations. If petitioner is correct in its contention here, that the amount of a bad debt, if disallowed as a deduction for income tax purposes, should be on that account referred to the assets accounts and thus to accumulated earnings and profits, then this admittedly worthless debt, disallowed because of the mistake of X as to the year of deduction, should be restored to its accumulated earnings and profits for excess profits tax purposes and no adjustments thereto on account of that debt can ever be made.

We do not consider that any provision of the statute requires a result which so obviously works a distortion of "accumulated earnings and profits."

In cases such as *Butter-Nut Baking Co.*, 3 T. C. 423, the gain was not recognizable, and in that material respect they are distinguishable from the instant case.

Petitioner also cites cases arising under the war profits and excess profits tax statutes of the first World War period. The cases cited include *A. B. Spencer Lumber Co.*, 10 B. T. A. 452; *Pictorial Review Co.*, 5 B. T. A. 416; *Ruckman Coal Co.*, 5 B. T. A. 534; *Cadillac Automobile Co. of Ill.*, 5 B. T. A. 604; *Quadriga Mfg. Co.*, 2 B. T. A. 1119; *Russell Wheel & Fdry. Co.*, 3 B. T. A. 1168; *Liberty Insurance Bank*, 14 B. T. A. 1428; and *Mechanics Bank of Brooklyn*, 9 B. T. A. 1. Examination of these authorities immediately reveals one vital fact, common to all of them and lacking here, namely, that the debts there considered were not worthless at the time the Board held them to be includible in the computation of invested capital.

We are further of the opinion that petitioner can not be sustained in its contention that respondent is now estopped to deny that the portion of the partial bad debt deduction disallowed for the taxable year 1939 should be restored to invested capital. So far as the record discloses, there is nothing inconsistent with respondent's position at the time of the disallowances and now. The fact that respondent may have taken an inconsistent position with regard to the stipulation of certain other issues originally in dispute herein can not constitute estoppel, and does not warrant us in deciding against him on this issue. He may have been wrong on the issues stipulated; in our opinion he is correct upon this issue which is presented for our determination.

Petitioner contends in the alternative that if we decided that the amount of $1,361,495.81 disallowed by the respondent as a deduction in 1939 should not be restored to petitioner's accumulated earnings and profits, then it should be permitted to add to accumulated earnings and profits for the taxable years the sum of $1,319,644.21 which was the figure agreed upon by the parties as petitioner's taxable net income for 1939 for the purpose of settling its income tax liability for that year, after giving effect to the disallowance of $1,361,495.81 out of the $2,300,000 claimed as a deduction.

This contention ignores the realities of the situation as disclosed by the record. As we have already indicated in our prior discussion, the few facts pertaining to this issue which are contained in the record indicate that in 1939 petitioner had on its books an account receivable which was worthless and uncollectible in the amount of $2,300,000; this amount was charged off and deducted from its gross earnings for 1939, resulting in a loss for that year reported in its 1939 income tax return of $88,763.88, and this latter amount was subtracted from its accumulated earnings and profits as they were at the beginning of 1939. In this manner its accumulated earnings and profits were

adjusted to show the elimination of an asset in the amount of $2,300,000. The record indicates that such an adjustment was necessary to accurately state petitioner's real accumulated earnings and profits. Petitioner now contends that because only a part of this deduction was allowed for income tax purposes, in 1939, the taxable net income resulting from this disallowance should be added to accumulated earnings and profits. Thus this latter item would, in effect, reflect a reduction on account of the worthless debt of $2,300,000 only in the amount allowed as a deduction for income tax purposes.

For the reasons given in disposing of the issue to which this is advanced as an alternative, the contentions of petitioner can not be accorded validity.

<em>Decision will be entered under Rule 50.</em>