THE CAPITAL NATIONAL BANK OF SACRAMENTO, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20262.   Promulgated May 29, 1951.

*Harrison H. Simpson, Esq., Valentine Brookes, Esq.,* and *G. E. Oefinger, C. P. A.,* for the petitioner.
*T. M. Mather, Esq.,* for the respondent.

OPINION.

Harron, *Judge: Issue 1.* The first issue is whether certificates of deposit which were issued by petitioner and outstanding in 1942 and 1943 are properly includible in its borrowed capital under section 719 (a) (1) of the Internal Revenue Code.[2]

Petitioner relies upon the decision of this Court in *Ames Trust & Savings Bank,* 12 T. C. 770, in support of its contention that the certificates of deposit are includible in its borrowed capital. Since the submission of petitioner's argument on brief, however, the Court of Appeals for the Eighth Circuit has reversed the *Ames* case and decided that a time certificate of deposit is not a "certificate of indebtedness" which is includible in the borrowed capital of a bank under section 719 (a) (1). *Commissioner* v. *Ames Trust & Savings Bank,* 185 F. 2d 47 (1950). The Court of Appeals approved that part of Regulations 112, section 35.719–1, which is relied on by respondent,[3] and held that it was applicable to time deposits as well as to demand deposits. The Court of Appeals held that certificates of deposit are not includible in borrowed capital and said that:

Historically and recognizedly, bank deposits have never been regarded as representing "borrowed capital," within the commercial connotation of that term. As the Iowa Supreme Court said in *Elliott* v. *Capital City State Bank,* 128 Ia. 275, 276, 103 N. W. 777, 778, the term "deposit" always has had a meaning of its own, "peculiar to the banking business, and one that courts should recognize and deal with according to commercial usage and understanding." And such a transaction is without any of the characteristics of money borrowing. Certainly there is no intent on the part of an ordinary depositor to make a general loan to the bank. Nor is a bank permitted to deal with deposits as general loans, for the law, through legislative or administrative regulation, imposes limitations upon the manner and extent of the use of such funds, different from those on capital investment or borrowings. * * *

The decision of the Court of Appeals was expressly followed by us in *National Bank of Commerce,* 16 T. C. 769, in which

---

[2] SEC. 719. BORROWED INVESTED CAPITAL.

(a) Borrowed Capital.—The borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:
(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, * * *

[3] Regs. 112, sec. 35.719–1.

* * * * * * *

The term "certificate of indebtedness" includes only instruments having the general character of investment securities issued by a corporation as distinguishable from instruments evidencing debts arising in ordinary transactions between individuals. Borrowed capital does not include indebtedness incurred by a bank arising out of the receipt of a deposit and evidenced, for example, by a certificate of deposit, a passbook, a cashier's check, or a certified check.

we reviewed the question and held that certificates of deposit issued by a bank to its depositors are not includible in its borrowed capital under section 719 (a) (1). Cf. S. Rept. No. 2679, to accompany the Excess Profits Tax Act of 1950, 81st Cong., 2d Sess., p. 10 (1950), in which borrowed capital was defined to exclude the indebtedness of a bank to its depositors. There is nothing in the evidence in this proceeding which requires a contrary result. The question is controlled by *National Bank of Commerce* and *Commissioner* v. *Ames Trust & Savings Bank, supra.*

Petitioner argues that the certificates of deposit which it issued to the state and county treasurers present a stronger case for inclusion as borrowed capital under section 719 (a) (1) than do the certificates issued to private depositors because, under the laws of California,[4] petitioner was required to pledge security for the deposits by the state and county treasurers which were evidenced by the certificates. We are unable to find any merit in this argument.

Both classes of certificates of deposit were issued in the identical form. The fact that petitioner-bank was required to pledge security for the deposits made by the state and county treasurers does not change their nature as deposits and make them borrowed capital under section 719 (a) (1). This requirement merely establishes some preference in favor of the deposits of the state and county treasurers. The rationale of *Commissioner* v. *Ames Trust & Savings Bank, supra,* is no less applicable to the certificates of deposit issued to the state and county treasurers than it is to those issued to private depositors. In fact, under state law, a deposit made by the state or county treasurers is deemed to have been made in the state or county treasury,[5] and the issuance of the certificates is required as evidence of the deposit.[6]

It is held that the certificates of deposit issued by petitioner to private depositors and the certificates of deposit which it issued to the state and county treasurers do not constitute borrowed capital under section 719 (a) (1). Respondent's determination on this issue is sustained.

*Issue 2.* In 1930 and 1931, pursuant to the recommendation of the Comptroller of the Currency, petitioner set up out of its accumulated earnings and profits a valuation reserve of $100,000 primarily because of the partial worthlessness of Reclamation District bonds which it owned. The question under this issue is whether in computing its equity invested capital for 1942 and 1943, petitioner may increase its accumulated earnings and profits by that part of the $100,000 which

---

[4] Deering, General Laws of California (1937 Supp.), Act 2834, secs. 1, 4; Act 2834 (a), secs. 1, 4.

[5] *Ibid.*

[6] *Id.,* Act 2834, sec. 9; Act 2834 (a), sec. 9. These sections also provide that the state or county treasurers may withdraw the funds deposited by check or order.

is proportionate to the bonds still owned. Petitioner bases its position that it may increase its accumulated earnings and profits on the contention that there must be an actual charge-off before a partial bad debt loss can be allowed under the charge-off method and that it never made such a charge-off during 1930 and 1931, the years in which it took loss deductions of $50,000 each on its income tax returns because of the partial worthlessness of the bonds. Petitioner argues that the subsequent reduction in the carrying value of the bonds in 1932 has no effect on the propriety of the reduction in 1930 and 1931 of its accumulated earnings and profits by the segregation of part of its undivided profits in a valuation reserve.

The first question that must be decided under this issue is whether, assuming that petitioner is correct and a mistake of law was made whereby petitioner erroneously took partial bad debt deductions in 1930 and 1931, it is nevertheless estopped in this proceeding from assuming a position contrary to the position which it maintained in its returns for 1930 and 1931. It is undisputed that petitioner took as deductions in its returns for each of the years 1930 and 1931 $50,000 which it claimed under "Other deductions" as a "Reserve for Depreciation Loss on Bonds Per Order Chief Bank Examiner" (although the only tax benefit which it received from the deductions was as an offset to its net income of $5,564.54 computed without benefit of the deduction for 1930). However, petitioner did not make a false, or even an erroneous, misrepresentation of material fact to respondent in 1930 or 1931. Respondent was not ignorant of the truth, nor did he detrimentally change his position in reliance on any representation by petitioner. All the facts upon which the petitioner based the deductions on its returns were disclosed by petitioner, and its return for 1930 was investigated by a revenue agent with specific reference to the deduction taken because of the depreciation in value of the bonds, and the taking of the deduction was approved. The only mistake made was as to the law.

An analogous situation arose in *Commissioner* v. *Mellon* (C. A. 3, 1950), 184 F. 2d 157, affirming 12 T. C. 90. In that case, the taxpayer exchanged stock of one corporation for that of another corporation as part of a transaction which did not constitute a tax-free reorganization within the meaning of section 112 (i) (1) (A) of the Revenue Act of 1928. However, the Commissioner, upon being asked for a ruling on the tax effects of the transaction, erroneously ruled that a tax-free reorganization had occurred and that the gain resulting from the exchange of the stock was not to be recognized at that time. The taxpayer, therefore, reported no gain in his return for the year of exchange. In later years the taxpayer sold the stock which he had acquired, and the question arose as to whether or not the taxpayer was estopped from assuming an inconsistent position and claiming that

the adjusted basis of the stock was its fair market value at the time of receipt because the exchange was not part of a tax-free reorganization. In holding that the doctrine of estoppel could not be applied against the taxpayer, the court said:

The Commissioner's first point bears the earmarks of the defense of estoppel. Nevertheless, the record here leaves nothing to support it, for the Commissioner was acquainted with all the facts at the appropriate time; there was no misrepresentation, no misstatement, nor any failure to report. The long and short of it is that the Commissioner made an error of law in determining the taxpayers' (and trusts') income tax liability for 1930, which is now walled up by the statute of limitations. What the Commissioner urges, however, is a duty of consistency upon the part of the taxpayers in their dealings with him which requires that the earlier treatment be continued even though the taxpayers acted in good faith and the technical elements of estoppel may be absent. We think the weight of authority is against Commissioner on the facts of the cases here in controversy. * * *

See, also, *American Light & Traction Co.*, 42 B. T. A. 1121, affd. (C. A. 7, 1942), 125 F. 2d 365, 366; *Pancoast Hotel Co.*, 2 T. C. 362. Similarly, in this proceeding, the petitioner is not estopped from assuming a position inconsistent with the position which it took in its returns for 1930 and 1931, and it is entitled to establish the true nature of the alleged losses in 1930 and 1931.[7] Petitioner's contention under this issue, therefore, must be considered on its merits.

The concept of "earnings and profits" for the purpose of computing equity invested capital under section 718 (a) (4) is the same as the concept of "earnings and profits" under section 115 (1) for the purpose of identifying the source of taxable corporate dividends. *Bangor & Aroostook Railroad Co.*, 16 T. C. 578; *Taylor-Wharton Iron & Steel Co.*, 5 T. C. 768, 780–783; Regulations 112, section 33.718–2; H. Rept. No. 3002, 76th Cong., 3d Sess., p. 60 (1940). Under sections 115 and 718 (a) (4), earnings and profits can only be increased by gains or decreased by losses which are recognized under the law applicable to the year in which the gain or loss is claimed. *Commissioner* v. *South Texas Lumber Co.*, 333 U. S. 496; *Bangor & Aroostook Railroad Co.*, *supra;* see section 115 (1). It is necessary, therefore, to examine the law applicable to the years 1930 and 1931 in order to decide whether petitioner sustained losses from partial bad debts which could be deducted in those years.

The law which governs the years 1930 and 1931 is the Revenue Act of 1928. Under section 23 (j) of that statute, a bad debt deduction could be taken only for "debts ascertained to be worthless and charged off within the taxable year * * *; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt to be charged off in part." A taxpayer who ascertained that he had

[7] Under section 734 (b), adjustments for the inconsistent position can be made relating to the years 1930 and 1931. *Kawneer Co.*, 13 T. C. 336.

suffered a partial bad debt loss might elect either to take an immediate deduction for the partial worthlessness, or, if he desired, wait until the debt was totally worthless or until its ultimate disposition to take a deduction. *Moock Electric Supply Co.*, 41 B. T. A. 1209; *Blair* v. *Commissioner* (C. A. 2, 1937), 91 F. 2d 992; *E. Richard Meinig Co.*, 9 T. C. 976. Although there has been a conflict in the decisions, the preferable view and the one followed in the more recent cases is that a charge-off is a necessary condition precedent to the allowance of a partial bad debt deduction under the 1928 Act and the comparable provisions of the Revenue Acts of 1921, 1924, and 1926. *Santa Monica Mountain Park Co.* v. *United States* (C. A. 9, 1938), 99 F. 2d 450; *United States* v. *Beckman* (C. A. 3, 1939), 104 F. 2d 260; *Bender* v. *Heiner* (W. D. Pa., 1939), 27 F. Supp. 531; see, also, Regulations 74, article 191; Mertens, Law of Federal Income Taxation, vol. 5, section 30.26. Therefore, unless petitioner made a charge-off in those years of the amounts which it claimed as deductions because of the partial worthlessness of bonds in its 1930 and 1931 returns, the deductions were improper and petitioner's accumulated earnings and profits were erroneously reduced by the amount taken as a loss.

The evidence is clear that petitioner did not make any charge-off on its books of the partial worthlessness of the Reclamation District bonds in 1930 or 1931, during which years petitioner was on the specific charge-off method of accounting for bad debts. All that was done by petitioner in 1930 and 1931 was to set up a valuation reserve for depreciation of the bonds which it owned on the recommendation of the bank examiner. The amount at which the Reclamation District bonds were carried was not affected by the setting up of the reserve, which did not eliminate the partial worthlessness from petitioner's book assets. The reserve set up was a general reserve because of the finding of the bank examiner that there had been a substantial depreciation in the value of the bonds carried in petitioner's general bond account. No specific charge-off of any part of the Reclamation District bonds was made in 1930 or 1931.

In *Commercial Bank of Dawson*, 46 B. T. A. 526, the taxpayer-bank, which used the specific charge-off method in dealing with bad debts, created a reserve in the approximate amount of a write-down of bonds that it owned which had been proposed by a bank examiner. The bonds, themselves, were not written down in the years in question. In holding that the partial worthlessness of the bonds had not been charged off by the bank, and, therefore, that the bank was not entitled to a partial bad debt deduction, the Court said:

 * * * [The procedure followed] not only fails to demonstrate a charge-off of these items, but in fact indicates the contrary. It did not "effectually elimi-

nate the amount of the bad debt from the book assets of the taxpayer." *Ed C. Lasater*, 1 B. T. A. 956. There is no authorization for a taxpayer to use at the same time a charge-off and a reserve method for the deduction of bad debts. *Arthur J. Marks*, 9 B. T. A. 1047; *Rogers Peet Co.*, 21 B. T. A. 577; *Manistique Lumber & Supply Co.*, 29 B. T. A. 26. A taxpayer on the charge-off system can only comply with the statute by specific charge-off; and a reserve cannot exist in such a system as an over-all general treatment disregarding specific items, even if properly created in the first instance. *Rossin & Sons, Inc.* v. *Commissioner* (C. C. A., 2d Cir.), 113 Fed. (2d) 652. These rules apply as much to banks as to any other taxpayer. *Atlantic Bank & Trust Co.* v. *Commissioner* (C. C. A., 4th Cir.), 59 Fed. (2d) 363. It follows that petitioner did not charge off these items, as it was required to do, and the deduction must be disallowed.

In this proceeding as well, petitioner, having failed to meet the requirements of the statute, was not entitled to a partial bad debt deduction in 1930 or 1931. Petitioner's accumulated earnings and profits, therefore, were incorrectly reduced by the amounts taken as losses in those years.

The fact that petitioner was not entitled to take a deduction for a partial bad debt loss in either 1930 or 1931, however, does not mean that it was not entitled to take the loss at some future date. "Partial worthlessness, as distinguished from total uncollectibility is a ground which may be pursued or relinquished by a taxpayer entirely at his option," *Moock Electric Supply Co.*, *supra*, and if it is not pursued, the taxpayer may wait until the ultimate disposition of the debt to take a deduction. In this respect, this proceeding differs from *Seiberling Rubber Co.*, 8 T. C. 467, affd. in part (C. A. 6, 1948), 169 F. 2d 595. In the *Seiberling* case, the taxpayer did not have an option to take a partial bad debt deduction or not, as it desired, because a settlement agreement between the parties had provided that the taxpayer would not claim as a deduction in any other year that part of a claimed partial bad debt deduction which was disallowed in 1939. Since the loss had actually been suffered in years prior to 1939 and was properly recognizable in those years, the reduction which the taxpayer had made in its accumulated earnings and profits in the prior years was proper. However, in *Taylor-Wharton Iron & Steel Co.*, *supra*, at 786-7, it was recognized that the failure to take proper advantage of a partial bad debt loss, where the right to take a deduction upon the ultimate disposition of the debt was retained, would not reduce accumulated earnings and profits under section 718 (a) (4).

It is held that petitioner, in the computation of its equity invested capital, may increase its accumulated earnings and profits for the years 1942 and 1943 by that part of the $100,000 improperly charged against its accumulated earnings and profits in 1930 and 1931 which is proportionate to the Reclamation District bonds which it owned in 1942 and 1943.

*Issue 3.*  Petitioner sold some of the bonds in 1942 for $31,649.26. Petitioner claims that it suffered a loss of $13,705.80 from the sale, and that since it is a bank, it comes within the provisions of section 117 (i),[8] under which any net loss which it may have suffered from the sale or exchange of bonds, debentures, notes, or certificates, or other evidences of indebtedness during 1942 will be treated as an ordinary loss,[9] and will not be subject to the exclusion from adjusted income of capital losses which is contained in section 711 (a) (2) (D).  Respondent, however, contends that petitioner had a gain rather than a loss on the sale of bonds.[10]  The difference between the parties arises from the fact that respondent has determined that the adjusted basis of the bonds, as shown by petitioner's books, was $28,284.88, while petitioner has restored to the adjusted basis of the bonds that part of the $100,000 reduction in their basis which is proportionate to the bonds sold.  The question under this issue is the proper basis of the bonds under section 113 (b) (1) (A) for purposes of gain or loss from their sale, and depends on whether petitioner improperly reduced the basis of the bonds in 1932.  Whether petitioner improperly reduced the basis of the bonds in 1932, in turn, depends on whether or not it was entitled to a partial bad debt deduction because of the partial worthlessness of the bonds in 1930, 1931, or 1932.

Under section 113 (b) (1) (A), the adjusted basis of property for determining the gain or loss from its sale is the cost of the property, properly adjusted for "expenditures, receipts, losses, or other items, properly chargeable to capital account."  We have already decided under the second issue that petitioner was not entitled to a partial bad debt deduction because of the partial worthlessness of the bonds, and that the deduction improperly taken was not "properly chargeable to capital account" as a reduction of accumulated earnings and profits. It follows that that part of the $100,000 reduction in the basis of the bonds which is proportionate to the bonds sold in 1942 may be restored to their basis in order to determine the gain or loss upon their sale. The respondent's determination on this issue is reversed.

*Decision will be entered under Rule 50.*

---

[8] SEC. 117. (i) BOND, ETC., LOSSES OF BANKS.—For the purposes of this chapter, in the case of a bank, as defined in section 104, if the losses of the taxable year from sales or exchanges of bonds, debentures, notes, or certificates, or other evidence of indebtedness issued by any corporation (including one issued by a government or political subdivision thereof) with interest coupons or in registered form, exceed the gains of the taxable year from such sales or exchanges, no such sale or exchange shall be considered a sale or exchange of a capital asset.

[9] Examination of the deficiency notice discloses that if petitioner did, in fact, suffer a loss upon the sale of the bonds, it had a net loss from security sales within the meaning of section 117 (i) during 1942.  The exact amount of any such loss will have to be computed as part of a Rule 50 recomputation if petitioner did, in fact, suffer a deductible loss on the sale of the bonds.

[10] Any gain on the sale of the bonds would be a capital gain and would be excluded from the petitioner's excess profits net income under section 711 (a) (2) (D).