H. W. FINDLEY AND HELEN B. FINDLEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 40572.    Filed November 29, 1955.

*Sidney B. Gambill, Esq.,* and *Robert F. Banks, Esq.,* for the petitioners.

*Phillip O. North, Esq.,* for the respondent.

314

**OPINION.**

PIERCE, *Judge:* The foregoing findings of fact show that for a period of approximately 1 year from May 24, 1948, the petitioner and the contractors, Wilkinson and Booth, were engaged in stripping coal from a tract in Elk County, Pennsylvania; and that these operations involved outlays of money by petitioner under two contracts, both executed on said date. Under one contract, the petitioner redeemed mining equipment from a bank and sold it to the contractors on a conditional sale agreement and promissory note for $56,000, payable in monthly installments. Under the other contract, which provided for the stripping and loading of coal, the petitioner advanced moneys to cover the contractors' direct operating costs; agreed to allow them credits of $2.50 per ton of coal loaded into his trucks; and further agreed to apply such credits, first against the advances and then against the conditional sale contract, until both accounts had been balanced. It is only the advances made for payroll and other operating costs, the charges for merchandise sold, and certain items of interest (not the amounts of principal due under the conditional sale contract) which are directly involved in this proceeding.

Petitioner contends that the amounts due him for the items here involved constituted a business debt, and that for the year 1948 he should be allowed a partial bad debt deduction of $41,831.51 in respect of the same, under authority of section 23 (k) (1) of the Code. Respondent does not dispute petitioner's contentions regarding the character of the debt and the applicability of said statute, but he does deny that the deduction claimed for 1948 is allowable on the basis of the facts here present.

Section 23 (k) (1) provides, so far as here material, as follows:

SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:

   *     *     *     *     *     *     *

(k) BAD DEBTS.—
(1) GENERAL RULE.—Debts which become worthless within the taxable year; * * * and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *

It will be observed that where a specific debt has become *wholly worthless*, deduction therefor is allowable only in the year that it finally became worthless; and since actual worthlessness is the test, the dates of charge-off, ascertainment, or eventual "giving up" by the taxpayer on the possibility of recovery, are in effect immaterial. On the other hand, where a debt is claimed to have become only *partially worthless*, the scheme of the statute is otherwise. There the deduction is limited to an amount "not in excess of the part charged off within the taxable year"; and even as to such amount, a deduction is allowable only to the extent that the taxpayer is able to demonstrate to the satisfaction of the Commissioner that a part of the debt is not recoverable. Regs. 111, sec. 29.23 (k)–1 (*b*). The use of the word "may", in connection with the allowance of partial bad debt deductions by the Commissioner, implies a certain amount of discretion on his part; and the courts have recognized that his determinations, made in the exercise of such discretion, should not be disturbed unless they are plainly arbitrary or unreasonable. *International Proprietaries, Inc.*, 18 T. C. 133; *Wilson Bros. & Co.* v. *Commissioner*, 124 F. 2d 606, 609; *Stranahan* v. *Commissioner*, 42 F. 2d 729, certiorari denied 283 U. S. 822.

This does not mean that a taxpayer who has not made a partial bad debt charge-off, or who after making one has failed to procure the Commissioner's approval, is forever foreclosed from obtaining a deduction. The statute does not require that *partial* bad debts *must* be charged off or deducted in the year when the partial worthlessness occurs, or indeed in any other year prior to the time when the debt becomes wholly worthless. Thus, the taxpayer may, if he chooses, pass over the partial worthlessness in the current year, and charge off the same in some later year while the debt is still valuable in part; or on

the other hand, he may wait and take a deduction for the entire debt (or the portion thereof for which no deduction has previously been allowed) in the later year when the debt has become wholly worthless. *Capital National Bank of Sacramento*, 16 T. C. 1202; *E. Richard Meinig Co.*, 9 T. C. 976; and *Moock Electric Supply Co.*, 41 B. T. A. 1209.

The purpose of the charge-off, in the case of a debt claimed to have become worthless in part, is to perpetuate evidence of taxpayer's election to abandon part of the debt as an asset (cf. *Hamlen* v. *Welch*, 116 F. 2d 413)—a procedure which is unnecessary in the case of wholly worthless debts, where total worthlessness is the sole test. But the physical charge-off in itself is not sufficient to establish that part of the debt has either become worthless or been abandoned as an asset. The taxpayer has the burden of proving these facts—and it is in passing upon the sufficiency of such proof that the Commissioner has been given the discretion above mentioned. It seems obvious that partial worthlessness of an obligation must be evidenced by some event or some change in the financial condition of the debtor, subsequent to the time when the obligation was created, which adversely affects the debtor's ability to make repayment.

Applying these principles in the instant case, we are unable to conclude that the Commissioner's determination in disallowing the partial bad debt deduction for the year 1948 was either arbitrary or unreasonable.

It is our opinion that petitioner's proof falls short of establishing that the obligation of the contractors to repay the advances became partially worthless in 1948. When petitioner entered into the coal stripping arrangement on May 24, 1948, he knew that the contractors were without substantial assets; and the contract between the parties reflects an intention that repayment of petitioner's advances for operating costs would be made through credits at the rate of $2.50 per ton for coal loaded into petitioner's trucks. The first of such credits were not made until October 31, 1948, due to the necessity for transporting the equipment to the tract, opening access roads for trucks, and removing the overburden in preparation for actual coal digging. The credits made against the advances were as follows:

| | |
|---|---|
| Oct. 31, 1948 | $406.75 |
| Nov. 30, 1948 | 2,241.63 |
| Dec. 31, 1948 | 4,006.13 |
| Jan. 31, 1949 | 1,932.50 |
| Feb. 28, 1949 | 4,044.89 |
| Mar. 31, 1949 | 3,940.50 |
| Apr. 30, 1949 | 1,175.50 |
| May 31, 1949 | 1,884.41 |

There was ample coal in the tract which, if removed and loaded, would have provided sufficient credits to wipe out all the advances;

and the contractors had the equipment for digging the coal. There is no indication of any substantial change in their financial condition between May 24 and December 31, 1948, which adversely affected their ability to make repayment in the manner specifically provided. Also, there is no indication that the contractors had repudiated their agreement to dig the coal; to the contrary, petitioner's letter to them of December 1, 1948, infers that they wanted to load more, but that trade conditions in the coal market were curtailing his acceptance of greater loadings. Thus, the difficulty lay, not in obtaining coal from the contractors with which to make the credits, but rather in marketing the coal at an adequate price. The mere fact that the market had slacked off and thereby caused a slow-down of the loadings does not warrant the conclusion that repayment in the manner provided could not be made, and that the obligation had become partially worthless. Cf. *T. J. Donahoe*, 2 B. T. A. 355.

The evidence also fails to establish that petitioner partially abandoned the contractors' obligation as an asset prior to April 1949. As shown by the tables in our Findings of Fact, petitioner began making his advances in May 1948; and, although he was not obligated to make them for longer than 45 days, he actually continued to make them regularly on a bi-weekly basis until April 16, 1949. In his letter to the contractors of December 1, 1948, he directed attention to the large amounts of these advances; pointed out that adverse conditions of the coal market were limiting the amount of coal which he was taking; and suggested that the only solution was "to keep on plugging until such time as we can see daylight." Thereafter in another letter, written to his tax adviser on April 14, 1949, petitioner suggested "It might be in place to mention the reason I have carried this business deal on so far beyond the date set up in the contract." Also in this letter, he pointed out the amounts of the advances made through March 31, 1949; suggested that the then prevailing price for coal was only $2 per ton, as compared with the price of $2.50 per ton to be paid to the contractors; informed his tax adviser that he had on Wednesday, April 13, 1949, sent a certified engineer to measure the coal; and stated, "we have cancelled the Stripping Contract, and will replevin the equipment as of April 15, 1949." All these facts and statements negative any conclusion that, prior to April 1949, petitioner had partially abandoned as an asset, either the coal stripping agreement or the contractors' obligation to repay the advances through coal loadings.

Under paragraph ELEVENTH of the coal stripping agreement, petitioner had the right to terminate such agreement, either when the loadings did not reach a minimum of 6,000 tons per month, or "at any time in the event operations hereunder result in an operating loss on the part of Findley." In April 1949 he exercised not only this right,

but also his right to repossess the contractors' mining equipment. Such action deprived the contractors of their opportunity to load coal with which to repay the advances. And it was thereafter, at some time between April 15 and May 5, 1949, that petitioner made the partial charge-off entry. Thus, the worthlessness of the obligation, the abandonment of the obligation as an asset, and the charge-off to perpetuate evidence of such abandonment, all occurred in 1949 and not in 1948. The statute contains no provision whereby a debt which has become worthless in one taxable year by reason of events or circumstances occurring in such year may be related back in part to a prior taxable year for deduction as a partially worthless bad debt.

We hold that the respondent did not err in disallowing the partial bad debt deduction for the year 1948.

*Decision will be entered under Rule 50.*