FEDERAL UNION INSURANCE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 3968.   Promulgated June 30, 1945.

*John S. Breckinridge, Esq.*, for the petitioner.
*Laurence F. Casey, Esq.*, for the respondent.

## OPINION.

Hill, *Judge*: As a fire insurance company, petitioner is required by state laws to keep a reserve equal to the unearned portion of premiums on unexpired risks, less a credit for risks reinsured. This requirement of a reserve arises out of the fact that the insurer collects the whole premium in advance, whereas the protection can only be given as time elapses. *Utah Home Fire Insurance Co.*, 24 B. T. A. 225, 232; affd., 64 Fed. (2d) 763; certiorari denied, 290 U. S. 679. Since the petitioner writes policies for terms exceeding one year, at the end of a given year there are policies as to which petitioner's liability in the event of loss has not expired. The policyholders are protected by the requirement of such a reserve, which has been defined as "that portion of the premium which the company has not yet had time to earn." Huebner, Property Insurance, p. 217. The insurance laws of Ohio required petitioner to maintain a similar unearned premium reserve on unexpired ocean and marine risks.

The first issue involves the question as to whether the unearned premium reserve, including the Ohio reserve, should be included in equity invested capital under section 718 of the Internal Revenue Code, as amended by the Second Revenue Act of 1940,[1] for the com-

---

[1] SEC. 718. EQUITY INVESTED CAPITAL.

(a) DEFINITION.—The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

(1) Money Paid In.—Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital;

(2) Property Pain In.—Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. * * *

\* \* \* \* \* \* \*

(4) Earnings and Profits at Beginning of Year.—The accumulated earnings and profits as of the beginning of such taxable year; * * *

putation of petitioner's excess profits credit. In general, section 718 defines equity invested capital as including:

1. Money paid in for stock, or as paid-in surplus, or as contribution to capital.
2. Property paid in for stock, or as paid-in surplus, or as a contribution to capital.
3. The accumulated earnings and profits as of the beginning of such taxable year.

It is petitioner's contention that the reserve for unearned premiums is a part of its "accumulated earnings and profits."

Regulations 109 (as amended by T. D. 5059, 1941-2 C. B. 125) provides:

SEC. 30.718-1. DETERMINATION OF DAILY EQUITY INVESTED CAPITAL— MONEY AND PROPERTY PAID IN.

The equity invested capital for any day is determined as of the beginning of such day. The basis or starting point is found in the amount of money and property previously paid in for stock, or as paid-in surplus, or as a contribution to capital. The terms "money paid in" and "property paid in" do not include amounts received aˢ premiums by an insurance company subject to taxation under section 204.

\* \* \* \* \* \* \*

SEC. 30.718-2. DETERMINATION OF DAILY EQUITY INVESTED CAPITAL— ACCUMULATED EARNINGS AND PROFITS.

(a) IN GENERAL.—The term "accumulated earnings and profits" is not defined in the Internal Revenue Code. See, however, section 115 and the regulations prescribed thereunder as to the effect of certain transactions on earnings and profits, and section 30.718-4 as to the effect of the declaration and distribution of dividends. In general, the concept of "accumulated earnings and profits" for the purpose of the excess profits tax is the same as for the purpose of the income tax. See, for instance, section 19.115-3 of Regulations 103, as amended, relating to the computation of earnings and profits in the case of a corporation computing net income on the cash, accrual, or installment basis, or in the case of an insurance company taxable under section 204. \* \* \*

Thus, the regulations declare that, except where it may be otherwise specifically provided, "the concept of 'accumulated earnings and profits' for the purpose of the excess profits tax is the same as for the purpose of the income tax" and refer to section 19.115-3 of Regulations 103, as amended, with specific reference to insurance companies taxable under section 204. Regulations 103 (as amended by T. D. 5059, 1941-2 C. B. 125, 126), section 19.115-3, in turn provides that "\* \* \* an insurance company subject to taxation under section 204 shall exclude from earnings and profits that portion of any premium which is unearned under the provisions of section 204 (b) (5) and which is segregated accordingly in the unearned premium reserve." It is patent that this latter income tax regulation is well within the intendment of section 204. The scheme of taxation of insurance companies under that section does not include in income the gross receipts from premiums. It is only premiums earned during the year which are included in gross income. "Premiums earned" are defined

as gross premiums written during the taxable year (excluding therefrom return premiums and premiums paid for reinsurance) plus unearned premiums as of the close of the preceding year less unearned premiums as of the close of the taxable year. It is the net decrease in the reserve for unearned premiums that is subject to income tax and becomes accumulated earnings and profits. The receipt of unearned premiums thus is not treated as income. Gross premiums do not go through income to become surplus until they are earned in the sense that the risk for which they were paid has expired. It is only as funds leave the unearned premium reserve that they become taxable income and become a part of accumulated profits and earnings. These reserves for unearned premiums are not drawn from surplus, but represent and arise solely out of the receipt of gross premiums. *Utah Home Fire Insurance Co., supra; Central National Fire Insurance Co.*, 22 B. T. A. 1054. Thus, although the term "accumulated earnings and profits" is not defined in the Internal Revenue Code, it is clear that an item may not become a part of accumulated earnings and profits for income tax purposes except by going through the income account (*Central National Fire Insurance Co., supra*, p. 1058), and section 19.113–5 of Regulations 103, as amended, was valid in providing that "an insurance company subject to taxation under section 204 shall exclude from earnings and profits that portion of any premium which is unearned under the provisions of section 204 (b) (5) and which is segregated accordingly in the unearned premium reserve."

The question thus narrows to one of the validity of the excess profits tax regulation in declaring that "the concept of 'accumulated earnings and profits' for the purpose of the excess profits tax is the same as for the purpose of the income tax."

In *Butternut Baking Co.*, 3 T. C. 423, the excess profits tax was correlated with the income tax in the sense that that which was excluded from earnings and profits for purposes of the income tax was likewise excluded from accumulated earnings and profits for excess profits tax purposes. In that case the taxpayer realized gain in 1938 from insurance proceeds above the adjusted basis of its property which had been destroyed by fire, immediately used the entire amount in replacement of the destroyed assets, and in its income tax return for that year reported and was allowed the gain as nonrecognizable. In 1941 it claimed the amount of the realized gain as part of its invested capital as "accumulated earnings and profits" for excess profits tax purposes. We held that, since under section 501 (a) of the Second Revenue Act of 1940 such realized gain was not recognized for income tax purposes, the taxpayer could not utilize it to increase earnings and profits in computation of invested capital under section 718 (a) (4), *supra*.

Congress has clearly manifested its intent that there be such an interrelationship between the two acts. Section 728 provides: "The terms used in this subchapter shall have the same meaning as when used in Chapter 1." (Income Tax.) Again, the report of the Committee on Ways and Means (76th Cong., 3d sess., No. 2894, p. 41), to accompany the Second Revenue Bill of 1940, in explaining section 401 (section 501 when enacted), which amended section 115 and in its terms applied only to income tax, said:

The purpose of this amendment is to clarify the law with respect to what constitutes earnings and profits of a corporation. This is important not only for the purpose of determining whether distributions are taxable dividends but also in determining equity invested capital for excess-profits tax purposes.

Thus, in amending a section of the code dealing solely with the income tax, the Committee declared that one of the reasons for the change was to clarify the law with respect to excess profits tax.

The unearned premium reserve can not be said to be paid-in surplus, since as the premiums are "earned" they become accumulated earnings and profits or earned surplus and it would be a contradiction in terms to say that paid-in surplus could later become earned surplus. Nor does petitioner contend for the inclusion of this reserve as paid-in surplus.

Although state courts have held such reserves to be invested capital under state capital stock tax laws, this decision is not in conflict with them, since this opinion rests on the special statutory treatment of such reserves under Federal income tax law. This result is based on the Congressional intent expressed both in the statute and the committee report that the excess profits tax be interrelated with the income tax in that the terms of the two acts be given the same meaning.

It was held under the excess profits tax provisions of the Revenue Act of 1917 that legal reserves of life insurance companies were invested capital. *Duffy* v. *Mutual Benefit Life Ins. Co.*, 272 U. S. 613; *Atlantic Life Insurance Co.* v. *Moncure*, 35 Fed. (2d) 360; affd. *per curiam*, 44 Fed. (2d) 167; certiorari denied, 283 U. S. 823; and *Federal Life Insurance Co.*, 22 B. T. A. 132. Those decisions are not in point. Not only were they concerned with a different sort of reserve, but the Supreme Court opinion expressly did not consider whether the reserve could be regarded as "earned surplus" and treated it as "actual cash paid in  *  *  *  for stock or shares." While *Atlantic Life Insurance Co.* v. *Moncure, supra,* held the life insurance reserve to be invested capital both as "actual cash paid in  *  *  *  for stock or shares" and as "paid-in or earned surplus," it did not indicate whether it was referring to the "paid-in" or the "earned" surplus. Obviously, the court there intended to include the reserve in invested capital as "paid-in" surplus and not as "earned" surplus. While it would be consistent to hold that funds con-

tributed to a corporation were paid-in surplus as an alternative ground to holding them to be "actual cash paid in * * * for stock or shares," i. e., ordinary paid-in capital, it would be inconsistent to hold them to be *earned* surplus and also paid-in capital.

The Revenue Act of 1942 amended sections 718 and 719 of the Internal Revenue Code so as to allow insurance companies' reserves to be included in invested capital to one-half their amount as borrowed capital:

SEC. 205. COMPUTATION OF EXCESS PROFITS AND INVESTED CAPITAL OF INSURANCE COMPANIES.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(d) Section 718 (relating to equity invested capital) is amended by inserting at the end thereof the following new subsection:

"(f) The reserves of an insurance company shall not be included in computing equity invested capital under this section but shall be treated as borrowed capital as provided in section 719."

In its report (S. R. 1631, p. 185, 77th Cong., 2d sess.) accompanying that revenue act, the Finance Committee stated:

The treatment of insurance reserve as borrowed capital in section 205 is for the purpose of determining invested capital and does not mean that your committee regards these funds as in fact borrowed from the policyholders or believes that the policy contracts are in fact evidences of indebtedness.

While we place no reliance on this amendment in seeking the intention of the earlier Congress, since the inferences which may be drawn from this statement and from the 1942 Act are conflicting, as plausible an inference as any is that Congress is here recognizing the validity of the regulations under the 1940 Act and is so modifying the act as to permit the inclusion of one-half the reserves in invested capital under the heading of borrowed capital.

The second question is whether reinsurance recoverable on unpaid losses and unearned premiums on reinsurance in force are admissible assets for ratio purposes under section 720. Section 715 of the Internal Revenue Code, as added by the Second Revenue Act of 1940,[2] provides that the invested capital shall be reduced by an amount computed under section 720.[3] By section 720 all assets of the corporation are

---

[2] SEC. 715. DEFINITION OF INVESTED CAPITAL.

For the purposes of this subchapter the invested capital for any taxable year shall be the average invested capital for such year, determined under section 716, reduced by an amount computed under section 720 (relating to inadmissible assets). * * *

[3] SEC. 720. ADMISSIBLE AND INADMISSIBLE ASSETS.

(a) DEFINITIONS.—For the purposes of this subchapter—

(1) The term "inadmissible assets" means—

(A) Stock in corporations except stock in a foreign personal-holding company: and

(B) Except as provided in subsection (d), obligations described in section 22 (b) (4) any part of the interest from which is excludible from gross income or allowable as a credit against net income.

(2) The term "admissible assets" means all assets other than inadmissible assets.

(b) RATIO OF INADMISSIBLES TO TOTAL ASSETS.—The amount by which the average invested capital for any taxable year shall be reduced as provided in section 715 shall be an amount which is the same percentage of such average invested capital as the percentage which the total of the inadmissible assets is of the total of admissible and inadmissible assets. * * *

divided into admissible and inadmissible assets. The section enumerates the inadmissible assets and defines admissible assets as all assets other than inadmissibles. It then provides that average invested capital is to be reduced by an amount which is the same percentage of the average invested capital as the percentage which the total of the inadmissible assets is of the total of admissible and inadmissible assets.

An analysis of the respondent's argument reveals that it breaks down into two separate contentions. First, he maintains that these items are not assets at all. His further extension of this argument seems to be that even if they are assets Congress never intended to allow them to be included as admissible assets for the purposes of section 720. We first consider whether reinsurance recoverable on unpaid losses is an asset. The fact that the method of accounting permitted by state insurance authorities and adopted by petitioner does not display this item as an asset in the balance sheet, but rather as a reduction of the gross liability for unpaid losses, is not binding. Other items which are not so displayed are considered assets for excess profits tax purposes. Furthermore, the reinsurance recoverable on *paid losses* is treated as an asset. Whether the reinsurance is recovered before or after the insurer pays the loss is immaterial in determining whether such reinsurance is an asset.

Respondent argues that when the amount of the reinsurance is recovered by the insurer and disbursed to its policyholder in the event of a loss, the insurer is merely acting as a conduit for the payment of the loss. The fallacy of this contention is demonstrated by the situation which arises when the insurer becomes insolvent. Even though it pays only 50 cents on each dollar of claims against it, still it collects the full amount of the loss suffered and insured against with the reinsurer. *Blackstone* v. *Allemannia Fire Insurance Co.*, 56 N. Y. 104; *Mutual Safety Insurance Co.* v. *Hone*, 2 N. Y. 235. "The liability of a re-insurer is not affected by the insolvency of the re-insured company or the inability of the latter to fulfill its own contracts with the original insured." *Hicks* v. *Poe*, 269 U. S. 118, 121. *Allemannia Fire Insurance Co.* v. *Firemen's Insurance Co.*, 209 U. S. 326. Vance on Insurance (2d Ed., p. 947) explains this result as follows:

* * * Thus, if an insolvent company settles with its creditors at 50 per cent of their claim, the reinsurer cannot claim to have his liability to the insolvent insurer scaled down 50 per cent, *inasmuch as the right of the insolvent company to enforce its entire claim against the reinsurer is a part of the assets of the insolvent's estate*, and the reinsurer is not in a position to claim the benefits of a settlement that may have been made solely for the creditors. * * * [Italics supplied.]

Unearned premiums on reinsurance in force likewise are assets. This item corresponds to the prepaid insurance of a noninsurance corporation. It is well settled that prepaid insurance premiums are

assets. See Paton, Accountants' Handbook, 2d Ed., p. 301. Reinsurance is insurance purchased by the insurer to cover the situation where it wishes to diminish the risk it bears on the original policy. Should the reinsurer cancel its contract with the insurer the liability of the insurer to the policyholder remains the same. The only difference in the balance sheet situation of the insurer is that its cash assets are then increased by the amount of the unearned premiums returned to it and its unearned premiums on reinsurance in force are diminished by that same amount. These items are recognized as assets by the New York Insurance Law.[4]

Respondent contends that "However, it is almost fundamental to the conception of an asset that title thereto be complete and indefeasible in the holder thereof, and not subject to any contingency or possibility of divestiture whatsoever. * * * until the policy is cancelled, there is no more than a contingent receivable from the reinsurer, and certainly not a true asset. * * *" This contention proves too much, for if unearned premiums on reinsurance in force fail to meet this test, then ordinary prepaid insurance which has the same characteristics also fails to meet the test. As pointed out above, it is well settled that prepaid insurance is an asset.

We turn now to the second part of respondent's argument, namely, that even though these are assets, Congress never intended to allow them to be included as admissible assets for the purpose of section 720. Because the counting of unearned premiums on reinsurance in force as an asset of the original insurer leads to a doubling of asset values in that the reinsuring company has an increase of assets by the amount of premiums paid to it, the respondent contends that that is contrary to the intention of Congress. He argues that, since the purpose of the

---

[4] § 70. Admitted assets.

In determining the financial condition of a domestic or foreign insurer or the United States branch of an alien insurer for the purpose of applying the provisions of this chapter, there may be allowed as admitted assets of such insurer, unless otherwise specifically provided in this chapter, only the following assets owned by such insurer:

\* \* \* \* \* \* \*

7. Reinsurance recoverable by a ceding insurer: (a) from an insurer authorized to transact such business in this state, the full amount thereof: \* \* \*

Admitted assets may be allowed as deductions from corresponding liabilities and liabilities may be charged as deductions from assets and deductions from assets may be charged as liabilities, in accordance with the form of annual statement applicable to such insurer as prescribed by the superintendent, or otherwise in his discretion. \* \* \*

§ 77. Reinsurance, when permitted; effect on reserves.

1. Every insurer authorized to do an insurance business in this state, hereinafter called the "ceding insurer" may, subject to the limitations of this chapter, reinsure its risks and policy liabilities in any other insurer, hereinafter called the "assuming insurer", with the effects herein prescribed; but no prohibition or limitation herein contained shall invalidate any such contract of reinsurance as between the parties thereto. No credit shall be allowed, as an admitted asset or as a deduction from liability, to any ceding insurer for reinsurance made, ceded, renewed, or otherwise becoming effective after January first, nineteen hundred forty, unless the reinsurance shall be payable by the assuming insurer on the basis of the liability of the ceding insurer under the contract or contracts reinsured without diminution because of the insolvency of the ceding insurer. \* \* \*

invested capital credit against excess profits net income and correspondingly of the adjustment thereof by the use of the inadmissible asset ratio is to secure to the taxpayer a normal return on its investment, to allow a credit based on the same investment to more than one taxpayer would divert that purpose. The difficulty with this contention is that Congress has chosen the method of eliminating certain assets in the computation of the invested capital credit. Its method was to designate the assets it wished to eliminate as inadmissible assets and, as pointed out above, to reduce the invested capital by an amount which is the ratio of inadmissible assets to total assets made up of admissible and inadmissible assets. Congress specifically enumerated the inadmissible assets and defined admissible assets as all other assets. Respondent has agreed that the items in question do not fall within the definition of inadmissible assets. It had to do this because by no stretch of the imagination could it fit these items into the definition of inadmissible assets. In reality the respondent is seeking to reach a result similar to that which would be reached by including these as inadmissible assets. Since the respondent may not include these items in the ratio

$$\frac{\text{inadmissible}}{\text{admissible plus inadmissible}}$$

in the inadmissibles, he seeks to exclude them from the admissibles. Not only is this contrary to the method of elimination chosen by Congress, but also it leads to a different percentage reduction of invested capital than does the statutory method.

A glaring fallacy in respondent's contention is disclosed if we consider the case where the taxpayer has no inadmissible assets. The statute requires the reduction of the average invested capital only when there are inadmissible assets. "If a taxpayer owns any 'inadmissible assets' on any day during the taxable year, then section 715 relating to the computation of invested capital requires the average invested capital to be reduced in the same ratio as the inadmissible assets bear to the total assets." Sec. 30.720–1, Regulations 109. If an insurance company has no inadmissible assets the object sought by respondent here of eliminating this "duplication" of invested capital by the exclusion of these items from admissible assets could not be attained. Respondent's contention would only work in the fortuitous circumstance where taxpayer does have some inadmissible assets. Since these items are assets and do not come within the definition of inadmissible assets, they must be admissible assets.

Reviewed by the Court.

*Decision will be entered under Rule 50.*