THE WESTERN CASUALTY AND SURETY COMPANY, PETITIONER
v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5971-72.    Filed February 3, 1976.

*Reece A. Gardner* and *George E. Gibson,* for the petitioner.
*Edward G. Lavery,* for the respondent.

898

900

OPINION

During the taxable years at issue, petitioner was a stock fire and casualty insurance company subject to Federal income tax under section 831.[2] For purposes of this tax, section 832(a) defines "taxable income" as "gross income," as defined in section 832(b)(1), less the deductions allowed by section 832(c).

Under section 832(b)(1), an insurance company's "gross income" includes the gross amount earned during the taxable

[2] SEC. 831. TAX ON INSURANCE COMPANIES (OTHER THAN LIFE OF MUTUAL), MUTUAL MARINE INSURANCE COMPANIES, AND CERTAIN MUTUAL FIRE OR FLOOD INSURANCE COMPANIES.

(a) IMPOSITION OF TAX.—Taxes computed as provided in section 11 shall be imposed for each taxable year on the taxable income of—

(1) every insurance company (other than a life or mutual insurance company) * * *

year from its "underwriting income" as well as from certain other amounts not relevant in the instant case. Section 832(b)(3) defines "underwriting income" as premiums earned on insurance contracts during the taxable year less "losses incurred" and "expenses incurred." The term "losses incurred" is defined in section 832(b)(5) while "expenses incurred" is defined in section 832(b)(6). The two major issues in the instant case are whether petitioner correctly computed its deductions for "losses incurred" and "expenses incurred" in arriving at its "underwriting income" for the years at issue.

## Issue 1. Commission Expense Deductions

The first issue we must decide is whether petitioner was entitled to include unpaid commissions on deferred premium installments in its computation of "expenses incurred" under section 832(b)(6). If we decide that petitioner incorrectly included such commissions, we must decide whether respondent properly adjusted petitioner's 1967 taxable income under section 481.

For purposes of computing an insurance company's "underwriting income," section 832(b)(3) allows a deduction for "expenses incurred," and section 832(b)(6) defines this term as follows:

(6) EXPENSES INCURRED.—The term "expenses incurred" means all expenses shown on the annual statement approved by the National Convention of Insurance Commissioners, and shall be computed as follows: To all expenses paid during the taxable year, add expenses unpaid at the end of the taxable year and deduct expenses unpaid at the end of the preceding taxable year. For the purpose of computing the taxable income subject to the tax imposed by section 831, there shall be deducted from expenses incurred (as defined in this paragraph) all expenses incurred which are not allowed as deductions by subsection (c).

As stipulated by the parties, "deferred premium installments" are those portions of the total premiums due over the life of an insurance policy which need not be paid prior to the end of the calendar year in order to maintain coverage and which, in fact, have not been paid by that time. The policyholder is under no obligation to pay these deferred premium installments and, if he elects not to do so, the policy lapses and the policyholder receives no further coverage thereunder.

Petitioner pays commissions to its agents based upon the amount of premiums actually paid by the policyholder. Under those insurance policies with respect to which "deferred premium installments" are due, petitioner computes the total amount of the agent's commissions that will be payable on the policy if the policy is kept in force for its entire life and adds this amount to its reserve for commissions on deferred premium installments. During the year, this reserve is reduced by the amounts of any commissions actually paid to the agents. Thus, at the close of any taxable year, such reserve represents those commissions which petitioner would be required to pay its agents if and when the policyholders actually pay the deferred premium installments.

On its income tax returns for 1967, 1968, and 1969, petitioner, following the formula set forth in section 832(b)(6), computed its commission expense deductions as follows: to the commissions paid during the year it added the reserves for commissions on deferred premium installments at the close of the year and, from this total, it subtracted such reserves at the close of the preceding year.

Respondent determined that petitioner's liability to pay the commissions on deferred premium installments did not become fixed until the deferred premiums were actually paid. Since, at the close of the taxable years at issue, the policyholders who "owed" deferred premium installments had not paid such installments and were under no obligation to do so, respondent determined that all the events necessary to establish petitioner's liability for commissions on these installments had not occurred.

Thus, respondent determined that petitioner's commission expense deductions for 1967 and 1968 were overstated to the extent that such deductions included unpaid commissions on deferred premium installments.[3] We agree and, with respect to this issue, we hold for respondent.

We note that petitioner, in accordance with the instructions on filling out the income statement of the underwriting and investment exhibit on the annual statement form, is required to use the accrual method of accounting.

At the outset, we think it is clear that the unpaid commissions on deferred premium installments are inherently nonaccruable items of deduction. Section 1.446-1(c)(1)(ii), Income Tax Regs.,

---

[3] Respondent concedes, however, that petitioner's method of computation resulted in its commission expense deduction for 1969 being understated by $241,086.

provides that a deduction under the accrual method of accounting is not allowable for a taxable year unless all the events have occurred which establish the fact of the liability giving rise to such deduction. Clearly, in the instant case, petitioner's liability to pay these commissions is not fixed until the policyholder actually pays the deferred premium installments, which event had not occurred at the close of the taxable years for which the deductions were taken.

On this same point, the court stated in *Great Commonwealth Life Insurance Co. v. United States,* 491 F. 2d 109, 113-114 (5th Cir. 1974):

> There is no doubt that the government is entirely correct when it asserts that these agents' commissions are not accruable under generally accepted accounting principles. * * * Accrual of deductions has consistently been denied where not all the events necessary to fix the taxpayer's liability have occurred. * * * Under these authorities the commission expenses clearly are not properly accruable. [Citations omitted.]

We cannot accept petitioner's argument that its receipt of deferred premium installments should be viewed merely as a collection matter and that accrual of the related commission expense deductions is therefore proper because the obligation to pay such expenses is contingent only upon the collection of a receivable.

Petitioner cites us to a number of cases which we agree stand for this proposition,[4] but which we think are clearly distinguishable from the instant situation. These cases generally express the principle that where the obligation to make installment payments to the taxpayer is absolute and not contingent, the taxpayer's accrual of related commission expense deductions will not be disallowed merely because, due to the risk of collecting the premiums, such commissions might never be paid. In the instant case, however, the policyholders have no legal obligation to pay the deferred premium installments; they may refuse to pay such future premiums and allow the policy to lapse. Thus, petitioner has no legal right to collect these premiums, and its payment of the related commissions cannot be said to be merely contingent upon collection.

---

[4] *Air-Way Electric Appliance Corp. v. Guitteau,* 123 F. 2d 20 (6th Cir. 1941); *Ohmer Register Co. v. Commissioner,* 131 F. 2d 682 (6th Cir. 1942); *Central Cuba Sugar Co. v. Commissioner,* 198 F. 2d 214 (2d Cir. 1952); *W. S. Badcock Corp. v. Commissioner,* 491 F. 2d 1226 (5th Cir. 1974); *Warren Co.,* 46 B.T.A. 897 (1942), affd. 135 F. 2d 679 (5th Cir. 1943).

We think the resolution of the issue before us lies in the proper interpretation and application of the last sentence of section 832(b)(6), which provides that—

For the purpose of computing the taxable income subject to the tax imposed by section 831, there shall be deducted from expenses incurred (as defined in this paragraph) all expenses incurred which are not allowed as deductions by subsection (c).

Subsection (c) sets forth 13 separate allowable deductions in computing an insurance company's "taxable income." In the instant case, the controversy centers around paragraph (c)(1), which allows a deduction for "all ordinary and necessary expenses incurred, as provided in section 162 (relating to trade or business expenses)."

We think that by the inclusion of the above-quoted sentence Congress intended that no deduction from underwriting income for an "expense incurred" be allowed unless such deduction would also be allowable under subsection (c). In the instant case, this means that petitioner's commission expense deductions must meet the requirements of section 162 and, to the extent such deductions fail to qualify under that section, they must be disallowed.

Petitioner, however, urges a different interpretation of section 832(b)(6) and argues that this section defines "expenses incurred" as those "shown" in the annual statement. Thus, petitioner contends that because unpaid commissions are "shown" on the annual statement form, such expenses need not meet the requirements of section 162 in order to be deductible as "expenses incurred." Apparently, petitioner would relegate the last sentence of section 832(b)(6) to a requirement that only expenses incurred that are *not* "shown" on the annual statement be tested against subsection (c).

We believe that such an interpretation of this section would lead to some rather bizarre and unintended results. For example, since salaries are "shown" on the annual statement as an expense, respondent would be unable to rely on section 162 in order to disallow any portion that it found to be unreasonable. Likewise, all of the other typical trade or business expenses "shown" in the annual statement would be deductible regardless of whether the company had any records substantiating the payment of such expenses. Numerous examples of a similar nature come to mind,

and we cannot accept petitioner's contention that Congress intended that section 832(b)(6) be so construed.

We believe our interpretation of section 832(b)(6) is supported not only by commonsense but also by the only case we could find in which the treatment of "expenses incurred" has been the subject of litigation.

In *Western Casualty Co.,* 20 B.T.A. 738 (1930), the petitioner was a health and accident insurance company subject to tax under what is now section 831. The petitioner issued certain insurance policies which contained a provision allowing the policyholder a credit (referred to as a dividend) of 1 year's premium at the end of each 5-year period during which all the premiums were paid on the policy. The commissioner of insurance for the State of Colorado required the petitioner to set up, as of December 31, 1926, a reserve of $8,538.30 to cover this dividend provision and, on its 1926 income tax return, petitioner deducted the amount of the reserve from its gross income. Respondent, however, determined that this reserve represented a contingent liability and disallowed the claimed deduction.

Although this case involved the definition of "expenses incurred" under section 246(b)(7), Revenue Act of 1926, such definition is in all relevant aspects identical to that set forth in section 832(b)(6). After quoting this definition, we stated (20 B.T.A. at 741):

Petitioner contends that the item of $8,538.30 should be deducted from "underwriting income" as representing "expenses incurred" as the latter term is defined in section * * * [832(b)(6)], in that it was shown as an expense on the annual statement approved by the National Convention of Insurance Commissioners. This statement was not introduced in evidence, but regardless of that objection, we believe that the last sentence of section * * * [832(b)(6)], would preclude its deduction from "underwriting income" as "expenses incurred," since the item in question is not allowed as a deduction by * * * [subsec. (c)]. The petitioner's contention in this respect must be denied.

Thus, in *Western Casualty Co.,* even though the expense was "shown" on the annual statement, no "expense incurred" deduction was allowed because the item was not deductible under subsection (c).

Accordingly, we think the issue in the instant case narrows to the question of whether the commission expense deductions, as computed by petitioner and as reported on its income tax returns

for 1967 and 1968, would be allowable deductions under subsection (c). The answer is clear that they would not.

The only possible basis for allowing the commission expense deductions under subsection (c) would be under paragraph (c)(1), which refers to section 162. As we have previously noted, for an accrual basis taxpayer such as petitioner, a deduction for unpaid commissions on deferred premium installments would not be an allowable deduction under section 162 since all the events necessary to establish the fact of the liability giving rise to such deduction had not occurred during the taxable year in which the deduction was claimed.

The manner in which petitioner computed its commission expense deductions during 1967 and 1968 (viz, to commissions paid during each year it added unpaid commissions at the close of the year and subtracted unpaid commissions at the close of the preceding year) resulted in a claimed commission expense deduction for those years which included, in part, unpaid commissions on deferred premium installments. Thus, to the extent the amount of the claimed commission expense deductions for 1967 and 1968 included such unpaid commissions, the deductions would not be allowable deductions under section 162 and, therefore, are not allowable under section 832(b)(6).

Apart from the statutory interpretation question, petitioner strongly contends that its position on this issue is supported by our recent decision in *North American Life & Casualty Co.,* 63 T.C. 364 (1974). We disagree and, on the contrary, we think that the underlying rationale of that case supports our holding herein.

North American was an insurance company taxable under section 802, relating to the taxation of life insurance companies. The issue in that case involved the question of whether the petitioner was entitled to a deduction, under section 809(d)(12) in determining gain or loss from operations under section 809(b), for unpaid commissions on deferred premiums. North American conceded that the deferred premiums and the related commissions were not properly accruable as items of income or deductions because such items failed to satisfy the "all events test" of sec. 1.461-1(a)(2), Income Tax Regs.

We noted that, even though the deferred premiums were not properly accruable items of income, four circuit courts and this Court had previously held that section 809(c)(1) required the inclusion of such premiums in a life insurance company's income

even though the company had no legal right to collect such premiums. Therefore, with respect to the issue of whether the unpaid commissions were allowable deductions, petitioner argued that the "all events test" should be disregarded and that the proper approach was to match items of income and deductions. Accordingly, following the position of the Fifth Circuit in *Great Commonwealth Life Insurance Co. v. United States, supra,* we held that the petitioner was entitled to deduct the unpaid commissions since, if the deferred premiums were required to be included in income, the commission expenses attributable thereto must be allowed as a deduction in order to prevent a distortion of income.

In the instant case, however, petitioner is not a life insurance company and is subject to an entirely different scheme of taxation, a scheme which does not require it to include its deferred premium installments in income and which, in fact, expressly excludes such amounts from income.

Under section 832(b)(3), petitioner is required to include in "underwriting income" the "premiums earned on insurance contracts during the taxable year." Section 832(b)(4) provides, in part, as follows:

(4) PREMIUMS EARNED.—The term "premiums earned on insurance contracts during the taxable year" means an amount computed as follows:

(A) From the amount of gross premiums written on insurance contracts during the taxable year, deduct return premiums and premiums paid for reinsurance.

(B) To the result so obtained, add unearned premiums on outstanding business at the end of the preceding taxable year and deduct unearned premiums on outstanding business at the end of the taxable year.

The parties have stipulated that "deferred premium installments" are added to, and constitute a part of, the unearned premium reserve.[5] Thus, we think it is most instructive, and fatal to petitioner's reliance on *North American Life & Casualty Co., supra,* to observe the manner in which the unearned premium reserve is treated for income tax purposes. In *Federal Union Insurance Co.,* 5 T.C. 374 (1945), we described this treatment as follows at pages 376-377:

---

[5] The "unearned premium reserve" is referred to in sec. 832(b)(4) as the "unearned premiums on outstanding business." See *Bituminous Casualty Corp.,* 57 T.C. 58, 81 (1971).

The scheme of taxation of insurance companies under that section does not include in income the gross receipts from premiums. It is only premiums earned during the year which are included in gross income. "Premiums earned" are defined as gross premiums written during the taxable year (excluding therefrom return premiums and premiums paid for reinsurance) plus unearned premiums as of the close of the preceding year less unearned premiums as of the close of the taxable year. It is the net decrease in the reserve for unearned premiums that is subject to income tax and becomes accumulated earnings and profits. *The receipt of unearned premiums thus is not treated as income.* Gross premiums do not go through income to become surplus until they are earned in the sense that the risk for which they were paid has expired. It is only as funds leave the unearned premium reserve that they become taxable income and become a part of accumulated profits and earnings. * * * [Emphasis supplied.]

Thus, it is evident that, contrary to petitioner's assertion, the deferred premium installments, being as they are a part of the unearned premium reserve, are not included in petitioner's underwriting or taxable income.

The touchstone of our holding in *North American Life & Casualty Co., supra,* is that there should be a matching of related items of income and deductions in order to prevent a distortion of income. In the instant case, petitioner was not required to take the amount of its deferred premium installments into income. Accordingly, petitioner should not be allowed to take a deduction for the commissions related to these deferred premium installments. Only in this manner can the matching of related items of income and deductions sought by *North American Life & Casualty Co.* be achieved and a distortion of petitioner's income be avoided.

Petitioner argues that its deferred premium installments are included in income by reason of section 832(b)(4)(A) which includes the amount of "gross premiums" written on insurance contracts during the taxable year. In a superficial and highly semantical sense this is true; however, in order to prevent a distortion of income, we must be concerned not with the manner in which the "premiums earned" are computed for tax purposes but rather with the amount of such premiums which are actually subject to tax.

Petitioner next contends that its method of computing its commission expense deductions was in accordance with the method sanctioned by the National Convention of Insurance Commissioners and employed on the annual statement form and, thus, such method should be controlling for Federal tax purposes.

In support of this position, petitioner relies primarily on *New Hampshire Fire Insurance Co.*, 2 T.C. 708 (1943), affd. 146 F. 2d 697 (1st Cir. 1945).

On this point, respondent cites us to *Commissioner v. General Reins. Corp.*, 190 F. 2d 148 (2d Cir. 1951), revg. a Memorandum Opinion of this Court, as standing for the position that an insurance company must report its true net income and that the annual statement form serves only as a guide in making this computation. In further support of his position, respondent refers to section 1.832-4(a)(2), Income Tax Regs., which provides in part:

The underwriting and investment exhibit [of the annual statement form] is presumed to reflect the true net income of the company, and insofar as it is not inconsistent with the provisions of the Code will be recognized and used as a basis for that purpose. * * *

These two divergent positions, represented by *New Hampshire Fire Insurance Co.* on the one hand and by *General Reins. Corp.* and the regulations on the other, reflect a controversy that was the subject of considerable litigation prior to 1950. In 1950, however, the annual statement form was changed so as to harmonize the treatment of certain items reported thereon with that desired by the Service. See 8 Mertens, Law of Federal Income Taxation, sec. 44.47, p. 201 (1974 rev.). Although the stated position of this Court remains that enunciated in *New Hampshire Fire Insurance Co., supra,* the controversy surrounding this position has remained dormant since the institution of the changes to annual statement form. We are of the opinion that the facts and issue presented before us do not warrant a revival of that controversy in the instant case; cf. *Hanover Insurance Co.,* 65 T.C. 715 (1976).

In *New Hampshire Fire Insurance Co., supra,* we were faced with the question of whether, in determining "underwriting income," the petitioner should include certain "reinsurance" even though the accepted practice in all States was to omit this type of "reinsurance" in the computation of underwriting income on the convention form (now the annual statement). In holding that the reinsurance should not be included, we said (2 T.C. at 722):

It is obvious from the above discussion and explanation that Congress comprehended the completely universal use of the Convention Form; that it conformed the phraseology of the statute to the technical terms appearing in

the form; that for Federal tax purposes it adopted bodily the Convention Form and its method of reporting its transactions resulting in income, and that it had a thorough knowledge of the provisions of the form properly safeguarding the interests of the public. * * *

* * *

Therefore, the Convention Form as understood, followed, and applied in the insurance world must control the computation of income of the petitioners, insurance companies other than life or mutual.

Petitioner would have us choose between these two lines of cases and follow our decision in *New Hampshire Fire Insurance Co., supra.* We think such a choice is unnecessary since we are of the opinion that our holding in *New Hampshire Fire Insurance Co.* cannot logically be extended to cover the issue raised herein.

We say this for two reasons. First, *New Hampshire Fire Insurance Co.* did not involve or even mention the specific statutory language of section 832(b)(6). Thus, in that case we were not faced with the existence and meaning of the last sentence in that section and with the consequences of allowing business deductions unhampered by the restrictions of section 162.

Second, if *New Hampshire* stands for the position contended for by petitioner, we would, in that case, have had to overrule our earlier decision in *Western Casualty Co., supra.* In the above-quoted portion of *Western Casualty Co.,* we held that, regardless of whether the claimed deduction was shown in the annual statement, it was not allowable as an "expense incurred" since the item in question was not an allowable deduction under subsection (c). *Western Casualty Co.,* however, was neither overruled, distinguished, or even mentioned in *New Hampshire.* Obviously, the holding in *New Hampshire* was not intended to apply to the issue raised in *Western Casualty Co.,* and we likewise refuse to apply it here.

Petitioner has raised three additional arguments which we think can be disposed of rather quickly. First, petitioner states that it has consistently accrued both deferred premium installments and the related commission expenses for many years and, therefore, should be entitled to continue this procedure by reason of that portion of section 1.446-1(a)(2), Income Tax Regs., which provides:

A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be

regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year.

Petitioner, however, neglects to point out that this very same section of the regulation provides that no method of accounting is acceptable, "unless, in the opinion of the Commissioner, it clearly reflects income." Petitioner has a heavy burden in overcoming respondent's broad discretion in determining whether a taxpayer's method of accounting clearly reflects income. *Commissioner v. Hansen,* 360 U.S. 446 (1959); *Fort Howard Paper Co.,* 49 T.C. 275 (1967). Not only has petitioner failed to overcome this burden, but we think respondent has affirmatively proven that petitioner's method of accounting with respect to this particular item does not result in a clear reflection of income. Thus, we think that petitioner's reliance on this section of the regulations is misplaced.

Second, we think that petitioner's reference to a section of the Internal Revenue Manual relating to how respondent's agents are to treat commissions on prepaid premiums is irrelevant to the issue before us.

Finally, petitioner argues that the method of accounting for commission expense deductions sought by respondent will produce only a "minor acceleration of tax liability" and that, in the long run, its method and respondent's will produce the same results.

Suffice it to say that we do not find the tax liability for the years at issue to be "minor" and that our search is for a method that clearly reflects and does not distort income. That method belongs to respondent.

### Issue 2. Section 481 Adjustment

In general, section 481(a)[6] provides that, if a taxpayer computes his taxable income for any taxable year under a method

---

[6] SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.

(a) GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

of accounting that differs from the manner in which he computed his taxable income for the preceding taxable year, there shall be taken into account, in the year of the change, those adjustments necessary to prevent the duplication or omission of amounts of gross income or deduction.

Both parties agree, as do we, that the change in the method by which petitioner is required to account for its commission expense deductions constitutes a change in the treatment of a material item requiring an adjustment under section 481. Sec. 1.481-1(a)(1), Income Tax Regs. Further, we are in agreement with the parties that the change was not initiated by petitioner and, therefore, amounts applicable to years prior to 1954 should not be taken into account. Sec. 1.481-1(a)(2), Income Tax Regs.

In making the adjustment required by section 481, respondent included in petitioner's 1967 income the entire accumulated reserve for unpaid commissions as of the close of 1966 ($6,527,381) less the amount applicable to pre-1954 years ($122,939), or $6,404,442. The parties dispute the propriety of respondent's adjustment under section 481 by which the entire accumulated reserve was included in petitioner's 1967 income. We are unpersuaded by petitioner's arguments, and we hold for respondent.

Petitioner first argues that some of the unpaid commissions included in the unpaid commission reserve at the close of 1966 will never be required to be paid in 1967 or subsequent years because some deferred premium installments will not be paid. Thus, petitioner contends that there will never be a "duplication" of these amounts in future years and, therefore, respondent erred in including the entire 1966 reserve in the section 481 adjustment.

Under section 481(a)(2), respondent, in addition to making adjustments necessary to prevent the duplication of an item of deduction, must also make any adjustments which, by reason of the change, will result in an omission from the taxpayer's gross income. See S. Rept. No. 1622, 83d Cong., 2d Sess. 307 (1954). It is because of the necessity of this latter adjustment that, in the instant case, respondent correctly included the amount of the "non-duplicated" commission expenses in petitioner's 1967 gross income.

Under a well-established principle of income taxation, if a taxpayer received a tax benefit by deducting an expense in an

earlier year and such expense is never in fact paid (i.e., the expense is "recovered"), the taxpayer must include the amount of the expense in gross income in the year of recovery. *Chicago, R.I.&P. Ry. Co. v. Commissioner,* 47 F. 2d 990 (7th Cir. 1931); 1 Mertens, Law of Federal Income Taxation, sec. 7.37, pp. 124-125 (1974 rev.).

Under petitioner's accounting method which we have held to be erroneous, the unpaid commissions that were never paid were taken back into gross income through the formula by which petitioner computed its commission expense deduction. This deduction was computed by taking the sum of commissions paid during the current year plus those unpaid as of the close of that year and, from this total, subtracting the unpaid commissions as of the close of the preceding year. Accordingly, in any taxable year in which certain commissions became no longer payable (because the policyholder failed to pay the related deferred premium installments), those commissions would not be included in either commissions paid during the year or in commissions unpaid as of the close of that year. However, such commissions would be included in the unpaid commissions as of the close of the preceding year.

Since, under the formula, the preceding year's unpaid commissions serve to reduce the deduction taken for the current year, it is evident that in any year that certain commissions were determined not to be payable, petitioner's deduction for that year would be proportionately reduced. It is through this reduced deduction that petitioner, under its old method, took these recovered commission expenses into income.

Solely by reason of the change in the method by which petitioner must account for its commission expense deductions, it is clear that those commissions that will never be paid (i.e., "non-duplicated" commissions) will no longer serve to reduce the deduction taken and, thus, will not be taken into gross income as in 1966 and years prior thereto. Therefore, failure to adjust petitioner's 1967 income to account for commissions that will never be paid would result in an omission from gross income.

Moreover, we note that in two prior cases where we held that certain expenses were improperly accrued and deducted in earlier years by failure to satisfy the "all events test," we nevertheless held that the proper section 481 adjustment in the year of the change was the balance of the improperly accrued expenses in the

immediately preceding year. *Shepherd Construction Co.,* 51 T.C. 890, 899 (1969); *Peoples Bank & Trust Co.,* 50 T.C. 750, 756 (1968).

In both of these cases, it was entirely conceivable, and in fact probable, that a portion of these accrued and deducted expenses would never again become deductible. Although not expressly articulated in either case, we think the rationale for including these nonduplicated expenses is that expressed herein—such expenses would otherwise have had to be taken into gross income and, therefore, must also be included as part of the section 481 adjustment to prevent an omission from gross income.

Petitioner's second argument is that section 481 requires only an adjustment in the year of the change equal to the amounts that would be omitted or duplicated in that particular year. To interpret this section otherwise, petitioner argues, is to do violence to the well-established principle of income tax accounting that the current year's income should not include income allocable to a different year.

Petitioner admits that the statute does not explicitly state that the adjustments required by section 481 should be so limited and does not cite us to any legislative history or prior cases to support such an interpretation. Our research has likewise failed to come up with any authority for this proposition.

We are of the opinion that petitioner's interpretation of section 481 is contrary to the intent underlying its adoption. As we said in *Fred P. Pursell,* 38 T.C. 263, 271 (1962):

The general purpose of the original section 481 seems obvious. It was to prevent income from escaping tax altogether and to prevent double taxation of income where such escape or doubling up resulted solely from a change in method of computing taxable income, regardless of why the change was made and whether it was made by the taxpayer or the Commissioner. * * * The only tests were to be whether the adjustment would prevent income from being duplicated or omitted, and whether the adjustment was made necessary solely by reason of the change in method of computing taxable income. * * *

We think that the lawmakers must surely have anticipated that the duplication or omission of amounts of gross income or deduction could conceivably occur in a year subsequent to the year of the change. If they had intended to impose an additional test restricting the adjustment to only those items duplicated or omitted in the year of the change, we think they would have so

stated either in the statute or committee reports. Finding no such statements, we will not impute such an intent here.

With respect to the alleged inconsistency between our interpretation of section 481 and the principle of income tax accounting that a current year's income should not include income allocable to a different year, we think a statement on this point we made in *Hulond R. Ryan,* 42 T.C. 386, 395 (1964), retains its vitality today:

Most of those cases were decided before the adoption of sections 446 and 481 of the 1954 Code and were not concerned with the provisions of those sections, which apply here. * * * In any event we do not think it is inconsistent with the rule enunciated by the above cases for Congress to provide that where there is a change in method of accounting there shall be taken into account those adjustments which are necessary solely by reason of the change to prevent amounts from being omitted or duplicated.

Finally, this Court has implicitly recognized that adjustments can be made to prevent a duplication that will occur in years subsequent to the year of the change. In *Shepherd Construction Co., supra,* we held that petitioner, under its old method of accounting, had improperly accrued and deducted certain "retainage" expenses because such expenses did not satisfy the "all events test." In holding that the entire amount of the retainage expenses accrued and deducted in years preceding the change were properly includable in petitioner's gross income in the year of the change, we stated (51 T.C. at 899):

A total retainage of $101,869.35 was improperly accrued and deducted by petitioner in years barred by the statute of limitations (petitioner's taxable year ended March 31, 1960, and years prior thereto). Under its new method of accounting, this entire amount will be properly accruable *in years 1961 and thereafter* upon final inspection and acceptance of the prime contracts. Section 481 was enacted for the express purpose of allowing in the year of change an adjustment of just such an amount, whether that amount relates to gross income or deduction, "in order to prevent amounts from being duplicated or omitted." * * * [Emphasis supplied.]

### *Issue 3. "Losses Incurred" Deductions*

In computing its underwriting income under section 832(b)(3), petitioner is allowed a deduction for "losses incurred." This term is defined in section 832(b)(5) as follows:

(5) LOSSES INCURRED.—The term "losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows:

(A) To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year.

(B) To the result so obtained, add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year.

Under the above definition, the computation of the "losses incurred" deduction includes the company's unpaid loss reserve at the end of the taxable year.[7] This reserve is an estimate, made at the close of the current taxable year, of losses the company anticipates it will be required to pay in future years.

Respondent recognizes and accepts the inherently imprecise nature of "losses incurred" deduction, but in section 1.832-4(a)(5) and (b), Income Tax Regs.,[8] provides:

(5) In computing "losses incurred" the determination of unpaid losses at the close of each year must represent actual unpaid losses as nearly as it is possible to ascertain them.

(b) Every insurance company to which this section applies must be prepared to establish to the satisfaction of the district director that the part of the deduction for "losses incurred" which represents unpaid losses at the close of the taxable year comprises only actual unpaid losses stated in amounts which, based upon the facts in each case and the company's experience with similar cases, can be said to represent a fair and reasonable estimate of the amount the company will be required to pay. Amounts included in, or added to, the estimates of such losses which, in the opinion of the district director are in excess of the actual liability determined as provided in the preceding sentence will be disallowed as a deduction. The district director may require any such insurance company to submit such detailed information with respect to its actual experience as is deemed necessary to establish the reasonableness of the deduction for "losses incurred."

In the instant case, petitioner issues insurance policies against loss in 19 separate categories of insurance coverage.[9] As of December 31 of each year, petitioner establishes an unpaid loss reserve for each line. It is the combined total of these 19 separate loss reserves that constitutes petitioner's unpaid loss reserve at the end of the taxable year for purposes of computing that year's "losses incurred" deduction.

---

[7] In the language of the Code, the "unpaid losses outstanding at the end of the taxable year."

[8] We have recently upheld this regulation in *Hanover Insurance Co.*, 65 T.C. 715 (1976).

[9] Sixteen lines are listed in schedule O of the annual statement and three lines are listed on schedule P.

In testing the reasonableness of petitioner's unpaid loss reserve for each of the years at issue, respondent used the following testing technique: for each of the 19 separate lines of insurance coverage, respondent compared the unpaid loss reserves established in years prior to the year under examination with the losses actually paid in such years.[10] For each line of coverage where this comparison showed that a reserve in prior years had been overstated by an average of more than 15 percent, the reserve in that line for the year under examination was reduced. However, in those lines where the test showed that a reserve in prior years had been understated by more than 15 percent, no adjustment was made.

Petitioner contends that this testing technique resulted in an unwarranted reduction in its total unpaid loss reserves for the years at issue (and, thus, a reduction in its "losses incurred" deductions) due to the fact that overstated reserves in certain lines were adjusted downward without a corresponding upward adjustment of understated reserves. Since the total reserve, and not the separate reserve established for each line of coverage, constitutes the unpaid loss reserve for purposes of computing the "losses incurred" deduction, petitioner contends that the reasonableness of the total reserve should be the focus of respondent's concern. Petitioner submits that its total unpaid loss reserves for the years at issue were not only reasonable but, in fact, were slightly understated when viewed in the light of prior experience. We agree and, with respect to this issue, we hold for petitioner.

Respondent defends his method of testing petitioner's loss reserves on the ground that insurance companies are conservative when valuing their potential loss liabilities and are more concerned with correcting deficient loss reserves than excessive ones. Thus, respondent argues that loss reserves shown by prior loss experience to have been deficient will already have been increased in the year under examination while those reserves found to have been excessive in prior years will remain so.

We do not doubt that, on the whole, insurance companies tend to be pessimistic concerning the size of their future loss liabilities and, therefore, take care to insure that loss reserves are adequate

---

[10] For the lines of coverage listed on schedule O, the 5-year periods immediately preceding each of the years at issue were used. For the three lines listed on schedule P, respondent used the 6th through the 10th years preceding each of the years at issue.

to meet all contingencies. However, we find such a broad generalization, standing alone, to be an insufficient basis on which to condone the one-sided nature of respondent's testing technique.

Moreover, we are not persuaded by the two arguments respondent offers to show that petitioner had, in fact, increased its deficient reserves for the years at issue. First, respondent alleges that, although the record does not so indicate, it is "probable" that petitioner had liberalized its case-by-case estimates and thereby had already increased reserves in those lines found to be deficient. Absent any evidence to this effect, we will not engage in such speculation.

Second, respondent argues that the voluntary loss reserves established by petitioner in its three schedule P lines of coverage were in excess of the historical deficiencies in these lines and that such excess amounts served to correct the deficiencies in certain schedule O lines.

We cannot accept this argument. Voluntary loss reserves, as stipulated by the parties, are an additional amount voluntarily included in the loss reserves for certain lines in which the reserves otherwise computed have historically proven inadequate. In the first place, the fact that the voluntary loss reserves established in the schedule P lines overcompensated for the historical deficiencies in such lines does not seem particularly surprising since this is the very purpose for which the voluntary reserves are established. If respondent is arguing that petitioner deliberately overstated its voluntary loss reserves in the schedule P lines so as to have a spillover effect of increasing deficient reserves in the schedule O lines, we find no evidence in the record before us to impute to petitioner such duplicity.

In any event, we agree with petitioner that respondent's test of reasonableness should be directed at the total unpaid loss reserve since it is this amount that is taken into account in the computation of the "losses incurred" deduction.[11] The following

---

[11] Furthermore, we note that in Rev. Proc. 75-56, 1975-52 I.R.B. 29, respondent states that, because of technological advances made by the insurance industry in the area of statistical collection and analysis, he can no longer justify use of the 15-percent tolerance factor in testing the reasonableness of estimated unpaid losses. Sec. 3.03 sets forth the method he will use and provides, in part, as follows:

The estimates for each line of business shall be separately tested on such basis to determine whether the estimate of unpaid losses for that line is reasonable. After the estimates of every line of business are adjusted *upward or downward,* as appropriate then such estimates are aggregated to arrive at the total adjusted estimate of unpaid losses. [Emphasis

figures support petitioner's position that its total reserves were not only accurate and reasonable but were actually slightly understated in light of prior experience:

| | Reserves established by petitioner | Reserves proposed by respondent | Reserves based upon experience [12] |
|---|---|---|---|
| 1967 | $40,860,716 | $40,196,003 | $41,705,264 |
| 1968 | 45,837,974 | 45,072,561 | 47,293,185 |
| 1969 | 50,271,411 | 49,457,603 | 52,878,865 |

These figures clearly demonstrate the reasonableness of the reserves established by petitioner for the years at issue and we find no reason why such reserves, already slightly understated, should be reduced.

*Decision will be entered under Rule 155.*

supplied.]

This revenue procedure is applicable to all taxable years, and only the absence of a provision for a tolerance factor is limited to years beginning after Dec. 29, 1975. Sec. 5, Rev. Proc. 75-56, *supra.* Thus, respondent's position appears to be that, although the use of the 15-percent tolerance factor would be applicable to the years at issue in the instant case, the provision approving the upward or *downward* adjustment of estimated loss reserves is applicable to all taxable years.

[12] This column shows the reserves that would be established if the testing technique used by respondent were employed, with the following two exceptions: (1) The computation applied a ratio of 1.00:1 rather than 1.15:1, thereby eliminating the 15-percent tolerance, and (2) reserves for all lines of insurance were adjusted to 1.00:1, not merely the reserves for which the ratio exceeded 1.00:1.